# STATE OF CONNECTICUT *v.* BOBBY GRIFFIN
## (SC 20439)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of the crimes of murder, criminal attempt to commit robbery in
the first degree, conspiracy to commit robbery in the first degree, and
criminal possession of a firearm in connection with the shooting death
of the victim, the defendant appealed to this court. Several days after
the shooting, a confidential informant told a detective, P, about a conver-
sation he had with the defendant in which the defendant admitted to
murdering the victim and wanting to sell the rifle that he had used to

State *v.* Griffin

do so. At P's urging, the informant went to the defendant's residence to place a hold on the rifle. During the ride back to the police station, the informant told P that he saw a rifle and ammunition in the defendant's bedroom. P immediately began preparing an application for a search warrant while the police surveilled the defendant's residence. The police became concerned that their presence had been noticed and entered the defendant's residence in order to secure it until the warrant was obtained. During a protective sweep, an officer entered the defendant's attic and saw the rifle in plain view. The search warrant application was then approved on the basis of P's affidavit, in which P averred, inter alia, that the police were relying on an informant whose "information has been proven true and reliable." Thereafter, the defendant was detained and, in the early morning, brought to the station, where he waived his *Miranda* rights. He was then interviewed by two detectives, N and Z, for more than three hours, during which he confessed to the murder. Prior to trial, the defendant filed motions to suppress the rifle and other evidence discovered during the search of his residence and the statements he had made to N and Z during the interrogation. Specifically, he claimed that the rifle was illegally obtained during a warrantless search and that his confession was involuntary as a result of certain coercive interrogation tactics employed by N and Z, namely, interviewing him while he was sleep-deprived, presenting him with false evidence of his guilt, maximizing the consequences of not confessing, threatening his family with arrest, and suggesting that his confession would be met with leniency. The trial court denied both motions, concluding, inter alia, that the defendant's confession was voluntary. With respect to the rifle, the court concluded that exigent circumstances justified the warrantless entry into the defendant's residence and that, even if the entry into the attic was not permitted as part of the protective sweep, the rifle was admissible under the independent source doctrine on the ground that the search warrant that was issued was supported by probable cause independent of any information obtained during the initial entry. *Held*:

1. The defendant could not prevail on his claim that the trial court had improperly denied his motion to suppress the evidence found during the warrantless search of his residence, because, regardless of whether the initial entry and protective sweep were justified by exigent circumstances, the trial court correctly determined that the evidence was admissible pursuant to the independent source doctrine, as that evidence would have been lawfully and inevitably discovered pursuant to the search warrant: the defendant conceded, and this court agreed, that the decision to seek the search warrant, which P was preparing before the initial entry took place, was not prompted by information obtained during the initial entry and protective sweep, and P's affidavit in support of the search warrant, excised of any potentially tainted information from the initial entry, established probable cause to search the defen-

State *v.* Griffin

dant's residence; moreover, although P's affidavit did not disclose any details to substantiate his averment that the informant's information had been "proven true and reliable," other aspects of the affidavit established the informant's reliability, as the affidavit made clear that the informant's identity was known to the police, stated that the informant would be willing to testify in court in the future, indicated that P independently corroborated certain information provided by the informant, including the caliber of the firearm used in the shooting, and noted that the information the informant provided to P was based on the informant's firsthand observations while at the defendant's residence.

2. There was no merit to the defendant's claim that the trial court had improperly admitted his statements to N and Z on the ground that those statements were not voluntary and that their admission therefore violated his due process rights under the federal and state constitutions: a. The trial court correctly determined that the state met its burden under the federal constitution of establishing the voluntariness of the defendant's statements by a preponderance of the evidence, as the record demonstrated that the combined effect of the interrogation tactics employed by N and Z did not cause the defendant's will to be overborne: although N and Z engaged in false evidence ploys by referring to evidence they did not have in order to give the impression that the state's case against the defendant was stronger than it actually was, most of the false evidence claims, viewed in light of the totality of the circumstances, were made during the first hour of the interview and were not particularly egregious, and the defendant demonstrated that he was capable of resisting and pushing back on these claims by falsely accusing another individual, Q, of the murder for more than two hours; moreover, the detectives' statements regarding the defendant's sentencing exposure were an accurate representation of the severity of the consequences that he faced, and, although N inappropriately referred to the death penalty during the interrogation, that was a single, isolated statement, the defendant had no audible reaction to it, and he continued to blame the murder on Q; furthermore, N's comment suggesting that members of the defendant's family would be arrested if he did not confess was not causally related to the confession of the defendant, who apparently recognized the threat as an empty ploy, and certain comments made by the detectives suggesting that the defendant would receive leniency if he confessed and that he could be charged with the lesser crime of manslaughter depending on the statement he gave were not inherently coercive, as N and Z did not make any definitive promise to the defendant or represent that they had the authority to determine the charges against him; in addition, the length of the interrogation was far shorter than other interrogations held not to have been inherently coercive, N and Z never subjected the defendant to physical abuse or threats of such abuse, the defendant twice waived his *Miranda* rights, and, although the defendant showed signs of being tired during the interrogation, he was lucid and responsive

State *v.* Griffin

throughout the interview, was able to understand the detectives' questions, communicated clearly and coherently, and pushed back on certain of the interrogation tactics by consistently denying his involvement in the murder, fabricating and maintaining the story that Q committed the murder, and pretending to cry to give credibility to his story.

b. Applying the factors set forth in *State* v. *Geisler* (222 Conn. 672), this court declined the defendant's request to adopt a prophylactic rule under the state constitution requiring Connecticut trial courts to consider whether coercive interrogation tactics, such as those employed in the present case, raise questions about the voluntariness of a confession: the text of the state due process clause did not support the defendant's claim, the defendant did not cite to any federal or Connecticut authority in support of his claim that the state due process clause requires a more stringent analysis regarding the admission of confessions, the only case from another state cited by the defendant was distinguishable, and the defendant did not refer to any evidence that the authors of our state constitution intended to provide greater protection against involuntary confessions; moreover, public policy did not support adopting the prophylactic rule urged by the defendant, as courts already are required to consider the coercive nature of an interrogation under the totality of the circumstances, and defendants are capable of vindicating such concerns by introducing social science evidence or expert testimony to demonstrate that the interrogation tactics employed by interrogators overbore an individual's will.

(*One justice concurring separately*; *one justice concurring
in part and dissenting in part*)

Argued June 1, 2020—officially released July 22, 2021*

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven, where the court, *Vitale, J.*, denied the defendant's motions to suppress certain evidence; thereafter, the first four counts were tried to the jury before *Vitale, J.*; verdict of guilty; subsequently, the charge of criminal possession of a firearm was tried to the court; finding of guilty; thereafter, the court

---

* July 22, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Griffin

vacated the felony murder conviction and rendered judgment of guilty of murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *John P. Doyle, Jr.*, executive assistant state's attorney, and *Sean P. McGuinness*, assistant state's attorney, for the appellee (state).

*Maura Barry Grinalds* and *Darcy McGraw* filed a brief for the Connecticut Innocence Project et al. as amici curiae.

*Opinion*

MULLINS, J. On October 14, 2013, the victim, Nathaniel Bradley, was fatally shot by someone who was attempting to rob him. After receiving a tip from a confidential informant, the police focused their investigation on the defendant, Bobby Griffin. The police discovered the rifle used in the murder hidden in the attic of the defendant's residence. After a three hour and thirty-eight minute interrogation, the defendant confessed that he shot and killed the victim while attempting to rob him. The defendant was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a), criminal attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-49 (a) (2), and conspiracy to commit robbery in the first degree in violation of Gen-

State *v.* Griffin

eral Statutes §§ 53a-134 (a) (2) and 53a-48 (a).[1] The defendant also was convicted, following a trial to the court, of criminal possession of a firearm in violation of General Statutes (Rev. to 2013) § 53a-217 (a) (1), as amended by No. 13-3, § 44, of the 2013 Public Acts (P.A. 13-3).[2]

In this direct appeal, the defendant claims that the trial court improperly denied his motions to suppress (1) the firearm and related evidence seized from his residence, which he claims were discovered as a result of an unlawful search, and (2) the incriminating statements he made during his interrogation at the police station, which he claims were involuntary. We disagree with the defendant's claims and, accordingly, affirm the judgment of the trial court.

The fact finder reasonably could have found the following facts. On the evening of October 14, 2013, the defendant was at a social gathering on Goffe Terrace in New Haven with Nathan Johnson, Ebony Wright, and several others. Throughout the evening, the defendant was openly carrying around a Hi-Point nine millimeter assault rifle, which he kept inside of a bag that was slung around his neck. At some point during the evening, the defendant told Johnson that he was looking for someone to rob. Johnson then showed the defendant a list of individuals who previously had sold him marijuana that he kept in his phone. The defendant scrolled through the list and selected the victim as the person he wanted to rob. At the defendant's direction, Wright contacted the victim and arranged for him to meet her

---

[1] The jury also found the defendant guilty of felony murder in violation of General Statutes § 53a-54c. The trial court subsequently vacated the felony murder conviction pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013).

[2] Hereinafter, all references to § 53a-217 in this opinion are to the 2013 revision of the statute, as amended by P.A. 13-3.

State *v.* Griffin

on Goffe Terrace under the pretense that she wanted to purchase marijuana from him.

Soon thereafter, the victim pulled up to the curb next to where the defendant, Wright and Johnson were walking, and Wright identified herself as the person who had contacted him. While Wright and the victim were talking, the defendant stepped into a dark alleyway, put on a mask and took out the assault rifle, which he had been carrying in his bag. The defendant approached the victim, who was standing by the trunk of his car, pointed the rifle at him and demanded that he hand over all the valuables he had in his possession. The victim told the defendant that he "could have everything" and began walking away from the defendant toward the driver's seat of his car. The defendant then shot the victim twice in the back at close range. The victim died from his wounds.

The defendant, Johnson and Wright fled the scene on foot. The defendant returned to his residence at 374 Peck Street in New Haven, where he hid the rifle in his attic. Two spent nine millimeter shell casings were left at the scene.

A few days after the shooting, the police received a tip from a confidential informant that the defendant had admitted his involvement in the homicide and was still in possession of the rifle he had used in committing it. Shortly after midnight, on October 20, 2013, the police searched the defendant's residence at 374 Peck Street and discovered the assault rifle, several magazines, one of which had an extended clip, and multiple boxes of ammunition in the attic. A ballistics analysis revealed that the two shell casings found at the scene of the shooting had been fired from the rifle.

Thereafter, the police arrested the defendant and transported him to the New Haven Police Department in the early morning hours of October 20, 2013. At

State *v.* Griffin

approximately 10:30 a.m. that morning, two detectives interviewed the defendant. Before questioning the defendant, the detectives advised the defendant of his *Miranda*[3] rights, and he waived those rights. Then, after approximately three hours of questioning, the defendant confessed that he had shot and killed the victim while attempting to rob him. The interview was recorded, as required by state law.

The state charged the defendant with murder, felony murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm. Prior to trial, the defendant filed motions to suppress the evidence discovered during the search of his home and the statements he had made to the police during his interrogation at the police station. After conducting an evidentiary hearing, the trial court issued memoranda of decision denying both motions.

After a trial, the jury found the defendant guilty of murder, felony murder and the robbery counts. The trial court found the defendant guilty of criminal possession of a firearm. After vacating the defendant's felony murder conviction; see footnote 1 of this opinion; the court imposed a total effective sentence of ninety years imprisonment without the possibility of release.

This direct appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court should have suppressed the rifle, ammunition, and magazines found in his home. Specifically, he argues that the police discovered these items as a result of an unlawful search of his residence, in violation of the fourth amendment

---

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

State *v.* Griffin

to the United States constitution and article first, § 7, of the Connecticut constitution. We disagree.

The following additional facts, as found by the trial court in its memorandum of decision denying the defendant's motion to suppress, are relevant to this claim. On October 18, 2013, Detective Martin Podsiad of the New Haven Police Department received a telephone call from a confidential informant who had served as a source of information for Podsiad in prior criminal investigations. The informant told Podsiad that he had recently had a conversation with the defendant in which the defendant admitted that he murdered the victim and indicated that he wanted to sell the rifle he had used to do so. The defendant sought to sell the rifle to the informant in exchange for cash and a handgun. Podsiad instructed the informant to arrange to purchase the rifle from the defendant with police funds. Podsiad determined, through a search of police department databases, that the defendant resided at 374 Peck Street in New Haven and had multiple felony convictions.

Podsiad believed that, in order to obtain a search warrant, he needed to verify the location of both the rifle and the defendant. At Podsiad's instruction, the informant arranged to meet the defendant at his residence the following evening, on October 19, 2013. At sometime between 6:30 and 8:30 p.m., Podsiad dropped the informant off at 374 Peck Street. Podsiad waited for the informant. The informant reemerged a few minutes later and, on the ride back to the police station, informed Podsiad that he saw a rifle and multiple boxes of ammunition in the defendant's bedroom. As he and Podsiad planned, the informant had given the defendant some money to place a hold on the rifle and told the defendant that he would return shortly thereafter with a handgun to complete the sale.

Podsiad immediately began preparing an application for a search warrant for 374 Peck Street. The police

State *v.* Griffin

set up surveillance around the building complex to prevent the defendant from leaving before the warrant could be obtained. They also began coordinating with a SWAT team to make the entry into the defendant's residence when the time came.

At approximately 10:30 p.m., while Podsiad was still preparing the search warrant application, the police stopped a vehicle leaving the parking lot of the 374 Peck Street building complex. The defendant's sister and another individual were in the vehicle. Although the police officers were driving an unmarked vehicle, they became concerned that people in the vicinity would notice their presence or that the occupants of the vehicle they had stopped might alert the defendant. The officers believed that, if the defendant received advance notice of their operation, he could escape with the rifle or begin preparing for a violent confrontation.

In light of these concerns, the officers decided to enter the defendant's residence in order to secure it until the warrant was obtained. They activated the SWAT team, which attempted to enter 374 Peck Street. The SWAT team chose the wrong door, however, and entered the adjacent apartment, 374B Peck Street. The defendant, who was inside his residence at 374 Peck Street, called the informant and told him not to return because the police were raiding the apartment next door.

Their element of surprise lost, the officers used a loudspeaker to order the occupants of 374 Peck Street to exit. The defendant and other occupants exited the residence. After detaining the defendant, the police entered the residence in order to conduct a protective sweep for any individuals who may not have exited. During the sweep, the officers noticed a small hole in the ceiling above the laundry area that led to the attic and thought someone might be hiding up there. An

State *v.* Griffin

officer entered the attic and saw the rifle in plain view. The officers then waited for the warrant to issue before conducting any further search of the home.

At approximately 2:30 a.m., on October 20, 2013, a judge approved the search warrant application. Podsiad's affidavit in support of the application consisted of six paragraphs, only the third, fourth, and fifth of which are pertinent to the issue of probable cause.[4] Those paragraphs provide in relevant part: "3. In the last . . . twenty-four hours, this affiant was contacted by a cooperating witness . . . whose information has been proven true and reliable. At this time, the [c]ooperating [w]itness is kept anonymous for her/his safety, but, in the future, [he or she] will be willing to testify in court. The [cooperating witness] had spoke[n] to [the defendant] in the last . . . five days . . . . [The defendant] had told the [cooperating witness] that he was responsible for the homicide [that] took place on [October 14, 2013], on 1617 Ella T. Grasso [Boulevard in New Haven] . . . . [The defendant] also [told] the [cooperating witness] that he still has possession of the firearm [that] he used in the homicide and that he is trying to get rid of it. [The defendant] also told the [cooperating witness] that the firearm is a [nine millimeter]. I contacted [Sergeant Karl] Jacobson, who confirmed that the weapon allegedly used in the homicide was a [nine millimeter].

"4. Within the last . . . twenty-four hours, the [cooperating witness] was inside [the defendant's] residence at 374 Peck [Street] [in] New Haven . . . . The [cooperating witness] confirmed that [the defendant] was in possession of a black, rifle type firearm. The firearm was located in [the defendant's] bedroom on the upper

---

[4] The first paragraph of the affidavit introduced the police officers' conducting the investigation, the second paragraph described the officers' training and experience, and the sixth paragraph averred that the information in the prior paragraphs established probable cause to believe that the defendant was storing a firearm at 374 Peck Street in violation of § 53a-217.

State *v.* Griffin

floor of the two story apartment at 374 Peck [Street]. There were also . . . two magazines in the bedroom, a box containing ammunition, caliber unknown, and drug bags and drug paraphernalia on top of his bed.

"5. At [10:30 p.m.] this evening, during the writing of this search warrant, surveillance teams in unmarked vehicles were stationed around the area of 374 Peck [Street] to [ensure that] no evidence left the residence. While conducting surveillance, the teams observed a subject leave 374 Peck [Street] and enter a [vehicle]. Believing that the subject . . . might be in possession of evidence from 374 Peck [Street], the vehicle was stopped . . . . Inside the vehicle were . . . two subjects, Tyrell Kennedy . . . and Bobbi Griffin . . . . During the stop, it was discovered that Bobbi Griffin is the sister of [the defendant]. Both parties were detained due to the fact that releasing them might afford them the opportunity to contact [the defendant], and evidence may be removed or destroyed. The New Haven Police Department SWAT team made entry into 374 Peck [Street] and secured the residents. Inside the residence was [the defendant, and a criminal records] check revealed [that he] is a convicted felon."

The defendant moved to suppress the rifle and related evidence, asserting that the search was unlawful under both the federal and state constitutions because the search warrant had not yet issued and there were no exigent circumstances justifying the officers' preemptive seizure of his residence. Following an evidentiary hearing, the trial court denied the defendant's motion.

In its memorandum of decision, the trial court concluded that the officers' initial entry into and search of the defendant's residence, although conducted before the search warrant was issued, were justified by exigent circumstances. The court determined that the officers had probable cause to believe that a rifle and ammuni-

State *v.* Griffin

tion were inside the residence, as well as "an objectively reasonable belief that immediate, physical entry . . . was necessary to prevent the destruction or removal of evidence, or the flight of the defendant, and that the failure to take such immediate action may have also endangered [their] safety" or that of others. The court further determined that the police were justified in entering the attic as part of a protective sweep of the residence and that, as a result of the protective sweep, the rifle and ammunition were visible in plain view.

Alternatively, the trial court concluded that, even if the entry into the attic was not permitted as part of a protective sweep, it was nonetheless lawful under the independent source and/or inevitable discovery doctrines. The court reasoned that the police were already in the process of obtaining a search warrant and that Podsiad's affidavit established probable cause without relying on any information obtained during the initial entry. The court therefore concluded that the evidence would lawfully have been discovered even if the initial entry was improper.

On appeal to this court, the defendant challenges both bases for the trial court's decision. With respect to the first, the defendant argues, in part, that the exigent circumstances exception is inapplicable in this case because the police created the exigency by stopping the vehicle that was leaving the defendant's residence. As to the second basis, the defendant concedes that, if Podsiad's search warrant affidavit established probable cause, then the seizure of the evidence was lawful under either the independent source or inevitable discovery doctrines, or under both doctrines. The defendant contends, however, that Podsiad's affidavit failed to establish probable cause because it was based on information provided by an informant, rather than Podsiad's own observations, and failed to set forth sufficient facts to establish the informant's reliability. We conclude that

State *v.* Griffin

Podsiad's affidavit was supported by probable cause and, therefore, that the trial court properly denied the defendant's motion to suppress based on the independent source doctrine.[5] Accordingly, we need not determine whether the initial warrantless entry and protective sweep were justified by exigent circumstances.

Before addressing the sufficiency of Podsiad's affidavit, we note briefly the relevant principles of the independent source doctrine. "It is well recognized that the exclusionary rule has no application [when] the [g]overnment learned of the evidence from an independent source. . . . Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity. . . . In the case of a search conducted pursuant to a search warrant, [t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 333, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

The defendant concedes, and we agree, that the police did not make their decision to seek the search warrant based on any information obtained during their allegedly unlawful entry and protective sweep because Podsiad had already begun the process of obtaining

---

[5] Because the present case fits neatly within the contours of the independent source doctrine, we do not address the closely related inevitable discovery doctrine. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 337–38, 743 A.2d 1 (1999) (discussing relationship between independent source and inevitable discovery doctrines), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

State *v.* Griffin

the warrant when the entry occurred. The remaining
question is whether Podsiad's affidavit, excised of any
potentially tainted information, established probable
cause for the search.[6]

"The determination of whether probable cause exists
to issue a search warrant under article first, § 7, of our
state constitution,[7] and under the fourth amendment to
the federal constitution,[8] is made pursuant to a totality
of the circumstances test. . . . Under this test, in
determining the existence of probable cause to search,
the issuing judge must make a practical, nontechnical
decision whether, given all the circumstances set forth
in the warrant affidavit, including the veracity and the
basis of knowledge of persons supplying hearsay infor-
mation, there is a fair probability that contraband or
evidence of a crime will be found in a particular
place. . . .

"If a search warrant affidavit is based on information
provided to the police by a confidential informant, the
issuing judge should examine the affidavit to determine
whether it adequately describes both the factual basis
of the informant's knowledge and the basis on which

---

[6] The only information in Podsiad's affidavit potentially tainted by the
allegedly unlawful initial entry is the statement in paragraph 5 that "[t]he
New Haven Police Department SWAT team made entry into 374 Peck [Street]
and secured the residents. Inside the residence was [the defendant] . . . ."
We therefore consider the adequacy of Podsiad's affidavit "shorn . . . of
that information." *State* v. *Cobb*, supra, 251 Conn. 334.

[7] Article first, § 7, of the Connecticut constitution provides: "The people
shall be secure in their persons, houses, papers and possessions from unrea-
sonable searches or seizures; and no warrant to search any place, or to
seize any person or things, shall issue without describing them as nearly
as may be, nor without probable cause supported by oath or affirmation."

[8] The fourth amendment to the United States constitution provides: "The
right of the people to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be violated, and no
warrants shall issue, but upon probable cause, supported by oath or affirma-
tion, and particularly describing the place to be searched, and the persons
or things to be seized."

State *v.* Griffin

the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the [judge] can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this determination, the [judge] is entitled to draw reasonable inferences from the facts presented.'' (Citations omitted; footnotes added; internal quotation marks omitted.) *State* v. *Rodriguez*, 223 Conn. 127, 134–35, 613 A.2d 211 (1992). Therefore, although no single factor is dispositive, ''the veracity or reliability and basis of knowledge of [the informant] are highly relevant in the issuing judge's analysis of the totality of the circumstances.'' (Internal quotation marks omitted.) *State* v. *Flores*, 319 Conn. 218, 226, 125 A.3d 157 (2015), cert. denied,　　U.S.　　, 136 S. Ct. 1529, 194 L. Ed. 2d 615 (2016); see also *State* v. *Respass*, 256 Conn. 164, 175, 770 A.2d 471 (''an informant's veracity or reliability and basis of knowledge should be regarded as closely intertwined issues that may usefully illuminate the [commonsense], practical question of the existence of probable cause'' (internal quotation marks omitted)), cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

''When [an issuing judge] has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the [issuing judge].'' (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 223 Conn. 135. ''[W]e will uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [issuing judge's] conclusion that probable cause existed. . . . [We] will not invalidate a warrant

State *v.* Griffin

. . . merely because we might, in the first instance, have reasonably declined to draw the inferences that were necessary . . . .'' (Citations omitted; internal quotation marks omitted.) *State* v. *Flores*, supra, 319 Conn. 225–26.

In the present case, the defendant's sole challenge to the adequacy of Podsiad's affidavit is that ''it does not provide sufficient information to establish the informant's reliability.'' The defendant's principal argument concerns the lack of any factual basis to indicate that the informant had a track record of providing reliable information. The defendant contends that the assertion in the affidavit that the informant's ''information has been proven true and reliable'' is too general and conclusory to be given any weight. Applying the totality of the circumstances test, we conclude that Podsiad's affidavit established probable cause.

We note at the outset that, although ''an informant's record of providing information that led to arrests and seizures of contraband is sufficient to establish [his or her] reliability''; *State* v. *Smith*, 257 Conn. 216, 224, 777 A.2d 182 (2001); see also *State* v. *Rodriguez*, supra, 223 Conn. 136; a good track record is not an essential prerequisite of reliability. ''[I]t is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy. . . . [The informant's] veracity can be shown in other ways.'' (Citations omitted; internal quotation marks omitted.) *United States* v. *Canfield*, 212 F.3d 713, 719 (2d Cir. 2000); see, e.g., *State* v. *Flores*, supra, 319 Conn. 226 (noting common factors for determining reliability of ''as yet untested'' informant);[9] *State* v. *Batts*, 281 Conn.

_____

[9] This court explained in *State* v. *Flores*, supra, 319 Conn. 218, that ''[t]hree of the most common factors used to evaluate the reliability of an informant's tip are (1) corroboration of the information by [the] police, (2) declarations against penal interest by the informant-declarant, and (3) the reputation and past criminal behavior of the suspect.'' (Internal quotation marks omitted.) Id., 226.

State *v.* Griffin

682, 704 n.9, 916 A.2d 788 ("[w]e disagree . . . that the
informant lacked reliability simply because he or she
had no established track record with the police"), cert.
denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d
524 (2007).

Nor do we entirely agree with the defendant that
the assertion in Podsiad's affidavit that the informant's
"information has been proven true and reliable" was
entitled to no weight in the reliability analysis. The
issuing judge reasonably could have inferred from this
assertion that the informant had provided information
to the police in connection with at least one prior crimi-
nal matter that proved to be true and reliable. Such an
assertion provides at least some information about the
informant's past performance.[10] See, e.g., *United States*
v. *Woosley*, 361 F.3d 924, 927–28 (6th Cir. 2004) (relying
on averment that informant " 'has provided accurate
information in the past' " in finding probable cause);
*State* v. *DeFusco*, 224 Conn. 627, 643, 620 A.2d 746 (1993)
(assertion in search warrant affidavit that informant
had been used " 'numerous times in the past for various
narcotic[s] cases' " permitted issuing judge reasonably
to infer that "the informant had given trustworthy infor-
mation in the past and, therefore, was reliable").

[10] We recognize, as the defendant points out, that, in *State* v. *DeFusco*,
224 Conn. 627, 620 A.2d 746 (1993), this court explained that "[t]he affiants'
assertion that the informant was reliable does not itself give the issuing
judge a basis [on] which to infer reliability." Id., 643. Nevertheless, this court
further explained that an affiant's statement that an informant had been
used in the past does give an issuing judge a basis to infer reliability. Id.
The difference between these two types of statements is well recognized.
"[A]n assertion that the informant is reliable leaves totally undisclosed the
basis on which that judgment was made, while an assertion that . . . his
past information was reliable at least indicates that the judgment is based
[on] the informant's past performance." 2 W. LaFave, Search and Seizure
(5th Ed. 2012) § 3.3 (b), p. 152. Because the affidavit in the present case
contained a statement that information provided by the informant in the
past had proved reliable, the affidavit provided a basis for the issuing judge
to infer reliability.

State *v.* Griffin

It is true, however, that the affidavit does not disclose any details to substantiate the averment that the informant's information has been proven true and reliable, such as the nature of the information, whether it led to any seizures, arrests, or convictions, or the number of times the informant provided information that was reliable. The inference of reliability certainly would have been better supported and on firmer footing if the affiant had specified that the informant's information had led to prior seizures, arrests, or convictions. Compare *State* v. *DeFusco*, supra, 224 Conn. 643–44 ("inference [of reliability] would have been better supported by an affirmative statement by the affiants that this informant's information had, in the past, led to arrests and convictions"), with *State* v. *Rodriguez*, supra, 223 Conn. 136 (affidavit specified that information provided by informant in prior cases had "led to arrests and convictions").

Thus, the affidavit in this case favorably characterizes the informant's past performance but "leaves the nature of that performance undisclosed, so that the [issuing judge] making the probable cause determination has no basis for judging whether the [police] officer's characterization of that performance is justified." 2 W. LaFave, Search and Seizure (5th Ed. 2012) § 3.3 (b), p. 152. Accordingly, we conclude that the unsupported assertion that the informant's information has proven to be true and reliable, although not irrelevant, was entitled only to slight weight in the probable cause analysis. See, e.g., *United States* v. *Foree*, 43 F.3d 1572, 1575–76 (11th Cir. 1995) (assertion that informant "has provided reliable information in the past" is " 'entitled to only slight weight' " because it " 'leaves the nature of that [past] performance undisclosed' "); *United States* v. *Miller*, 753 F.2d 1475, 1480 (9th Cir. 1985) (averment that informant had provided federal agent with prior information that agent " 'knows to be true

State *v.* Griffin

through investigative activity' " is "both unclear and conclusory" and, therefore, "entitled to only slight weight").

Nonetheless, other aspects of Podsiad's affidavit established the informant's reliability. First, as the defendant acknowledges, the affidavit makes clear that the informant's identity was known to the police. "[A]s this court has repeatedly recognized, [t]he fact that an informant's identity is known . . . is significant because the informant could expect adverse consequences if the information that he provided was erroneous. Those consequences might range from a loss of confidence or indulgence by the police to prosecution for . . . falsely reporting an incident under General Statutes § 53a-180 [c], had the information supplied proved to be a fabrication." (Internal quotation marks omitted.) *State* v. *Flores*, supra, 319 Conn. 228.

According to the affidavit, the informant told Podsiad that he had seen "a black, rifle type firearm," as well as two magazines and a box of ammunition, inside the defendant's bedroom at 374 Peck Street. If a search by the police did not uncover any such evidence, the informant reasonably "could have expected adverse consequences for relaying false information." *State* v. *Flores*, supra, 319 Conn. 228; see, e.g., *United States* v. *Foree*, supra, 43 F.3d 1576 ("[a]s [the informant's] report consisted of facts readily verifiable upon a subsequent search by the police . . . the [informant] was unlikely to be untruthful, for, if the warrant issued, lies would likely be discovered in short order"). Accordingly, it was reasonable for the issuing judge to infer that the informant's claim that he saw the rifle and related evidence in the defendant's bedroom had not been fabricated.

Second, the affidavit avers that, "in the future, [the informant] will be willing to testify in court." As the

State *v.* Griffin

Supreme Court of Virginia aptly observed, such an assertion bolsters the reliability of the information provided by the informant: "It is true, as the defendant argues, that the allegation that the informer was 'willing to testify in court' did not bind him to testify. But the average citizen knows that when he does appear in court he must take an oath to tell the truth, he faces a charge of perjury for testifying falsely, and he may be confronted with prior inconsistent statements when cross-examined. With this beforehand knowledge, when one expresses a willingness to testify in court and stand by what he has told the police, an aura of credibility is added to his story which establishes its probability." *McNeill* v. *Commonwealth*, 213 Va. 200, 203, 191 S.E.2d 1 (1972); see, e.g., *United States* v. *Brown*, 93 Fed. Appx. 454, 456 (3d Cir.) ("[t]he affidavit's recitation of the informant's availability to have his veracity tested at all court proceedings also bolstered the reliability of the informant's information"), cert. denied, 542 U.S. 914, 124 S. Ct. 2868, 159 L. Ed. 2d 285 (2004). Although we acknowledge that an informant's willingness to testify in court proceedings may not, on its own, be sufficient to establish reliability, it is nevertheless an appropriate factor for the issuing judge to consider when examining an affidavit.

Third, the affidavit indicates that Podsiad independently corroborated certain information provided by the informant. See, e.g., *State* v. *DeFusco*, supra, 224 Conn. 644 ("corroboration would be a proper ground on which to base an inference of reliability"). In particular, the affidavit asserts that the defendant told the informant that he shot the victim using a nine millimeter caliber firearm, and that Podsiad "contacted [another police officer involved in the investigation], who confirmed that the weapon allegedly used in the homicide was a [nine millimeter]." The corroboration of the caliber of the firearm used in the shooting entitled the issuing

State *v.* Griffin

judge to give greater weight to the informant's claim that the defendant admitted to shooting the victim with that same caliber weapon.[11] See, e.g., *State* v. *Rodriguez*, supra, 223 Conn. 137 (assertion in affidavit that informant saw defendant carrying " 'large caliber revolver' " shortly before shooting was corroborated, and thus entitled to reliability, by evidence that "the murders were committed with a large caliber handgun").

Moreover, contrary to the defendant's criticism that the affidavit failed to corroborate any details that "only the shooter might know," it is well settled that "[t]he police are not required . . . to corroborate all of the information provided by a confidential informant. . . . Partial corroboration may suffice." (Citations omitted.) *State* v. *Clark*, 297 Conn. 1, 11, 997 A.2d 461 (2010). We conclude that the corroboration of the weapon's caliber, in conjunction with the aforementioned factors, provided strong evidence of the informant's reliability.

Finally, any doubts as to whether the affidavit establishes the informant's reliability are mitigated by the clear showing of the informant's basis of knowledge. Under *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), an informant's reliability and basis of knowledge are no longer independent requirements for a finding of probable cause; rather, "a defi-

---

[11] The defendant asserts that the corroboration of the caliber of the firearm used in the shooting is of little significance because "[nine millimeter] is one of the most common ammunition types and appears in many Connecticut homicide cases." This court has questioned whether corroboration of "mundane facts" is entitled to weight in the probable cause analysis. See, e.g., *State* v. *DeFusco*, supra, 224 Conn. 645 n.24 ("we question whether verified information regarding such mundane facts as the defendant's address and the model of his cars, taken by itself, may properly be found to establish the reliability of an informant"). The defendant, however, introduced no evidence at the suppression hearing regarding the prevalence of firearms that fire nine millimeter ammunition. Therefore, we have no basis on which to question the issuing judge's reliance on the informant's corroboration of the caliber of the firearm used in the crimes.

State *v.* Griffin

ciency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'' Id., 233. ''It is clear from *Gates* that, in measuring overall the reliability of a tip, a fair indication of the informant's basis of knowledge may compensate for a less than conclusive demonstration of his credibility.'' *United States* v. *Laws*, 808 F.2d 92, 102 (D.C. Cir. 1986). Thus, ''even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.'' *Illinois* v. *Gates*, supra, 234; see, e.g., *State* v. *Johnson*, 286 Conn. 427, 440, 944 A.2d 297 (''the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him [firsthand] information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity'' (internal quotation marks omitted)), cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008).

Podsiad's affidavit indicates that the information the informant provided to him was based on the informant's firsthand observations. The affidavit alleges that the defendant admitted to the informant that he shot the victim, and that the informant personally observed the rifle and ammunition inside the defendant's residence. We conclude that the issuing judge could rely on this particularized knowledge to overcome uncertainty as to the informant's reliability or veracity. See, e.g., *State* v. *Smith*, supra, 257 Conn. 225 (noting that informant's overhearing of defendant's planning or admitting criminal activity was '' 'highly relevant' '' to establishing probable cause under *Gates*); *State* v. *Morrill*, 205 Conn. 560, 566, 534 A.2d 1165 (1987) (''The affidavit states that the informant personally observed the defendant sell [marijuana] and [that] he heard the defendant state

State *v.* Griffin

that he had ten pounds to sell. From these statements the [issuing judge] could reasonably have inferred that the defendant was engaged in the ongoing criminal activity of selling [marijuana].'').

Based on the totality of the circumstances, we conclude that Podsiad's search warrant affidavit, excised of any potentially tainted information from the initial warrantless entry, established probable cause to search the defendant's residence. Accordingly, the trial court properly denied the defendant's motion to suppress the evidence obtained during the search of his residence based on the independent source doctrine.

II

The defendant next claims that the trial court improperly denied his motion to suppress the statements he made to the police during his interrogation. Specifically, the defendant argues that, because the police officers subjected him to a series of coercive interrogation tactics that had the combined effect of overbearing his will, his statements were involuntary and, thus, should have been suppressed under the due process clause of the federal constitution.

In particular, the defendant asserts that the police officers overbore his will by (1) lying about the evidence they possessed in order to make their case against him seem stronger than it actually was, (2) maximizing the potential consequences if he did not confess by threatening him with lengthy prison sentences and, at one point, intimating that he could receive the death penalty, (3) telling him that his family members may be subject to arrest for possession of the assault rifle discovered during the search of 374 Peck Street, and (4) suggesting that he would face lesser charges or consequences if he did confess. The defendant further asserts that he was especially susceptible to these coercive tactics because he had not slept since the police had searched

State *v.* Griffin

his residence the night before. Alternatively, the defendant contends that his statements should have been suppressed under the Connecticut constitution. We disagree with the defendant's claims.

The following facts, which either were found by the trial court or are undisputed,[12] are relevant to this claim. At the time of the October 14, 2013 shooting, the defendant was twenty-one years old. He was in the process of obtaining his general equivalency diploma (GED) and had plans to pursue a degree in culinary arts and business management at Gateway Community College. He was employed full-time as a chef for Chipotle Mexican Grill (Chipotle). He had four prior felony convictions, most recently in September, 2010, for larceny in the third degree in violation of General Statutes § 53a-124. For that conviction, he was sentenced to five years imprisonment, execution suspended after thirty months, and three years of probation.[13]

Shortly after midnight, on October 20, 2013, while the police were conducting the preemptive sweep of the defendant's 374 Peck Street apartment, the defendant was detained on the scene in a police cruiser. The officers read the defendant his *Miranda* rights, which the defendant indicated he understood. Then, while the defendant was detained, Podsiad and an additional officer questioned him for approximately three minutes about the rifle they found in the attic. The defendant admitted that the gun belonged to him.[14]

---

[12] See *State* v. *Ashby*, 336 Conn. 452, 468, 247 A.3d 521 (2020) (Appellate review of the trial court's resolution of a constitutional claim "is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." (Internal quotation marks omitted.)).

[13] The defendant noted at one point during his interrogation that he "just came home six months ago." Presumably, this was a reference to the thirty month sentence he had served.

[14] The defendant does not challenge the voluntariness of this admission.

State *v.* Griffin

Sometime in the early morning hours of October 20, 2013, the defendant was transported to the New Haven Police Department and placed in a holding cell. The defendant was unable to sleep while in the holding cell because it did not have a bed.[15] Later that morning, Detectives Nicole Natale and David Zaweski of the New Haven Police Department asked the defendant if he was willing to speak with them, and the defendant indicated that he was.

At approximately 10:30 a.m., Natale and Zaweski brought the defendant to an interrogation room, where they interviewed him for approximately three hours and thirty-eight minutes. The interview was recorded on video. The interrogation room was approximately fifteen feet by fifteen feet. The detectives sat the defendant at a table facing the camera. Natale sat at the table across from the defendant, and Zaweski sat in a chair against the wall behind Natale. The interview proceeded in a question and answer format. Natale asked most of the questions, with Zaweski interjecting intermittently. Both officers remained seated at all times while questioning the defendant. There were three three to ten minute periods, approximately every hour, during which one or both of the officers left the room and the questioning ceased.

Natale began by advising the defendant of his *Miranda* rights. She handed the defendant a *Miranda* waiver form and had him read his rights out loud from the form. Natale then asked the defendant: "Do you

---

[15] The only evidence that the defendant had not slept came from his own testimony at trial. The state contends that we cannot rely on this testimony when assessing the voluntariness of the defendant's confession on appeal because it "is self-serving, uncorroborated, and disputed by the state." Because, however, the state has not identified any evidence that contravenes this aspect of the defendant's testimony, we assume for purposes of our analysis that the defendant did not sleep between when he was transported to the police station and when his interview began.

State *v.* Griffin

understand that? Are you willing to talk to us?'' The defendant responded: ''Yes.'' Zaweski then removed the defendant's handcuffs. The defendant then initialed each line of the waiver form and signed and dated it.[16]

Natale started with questions about the assault rifle and ammunition seized from the defendant's apartment at 374 Peck Street. The defendant claimed that the rifle belonged to a third party, whom he identified as ''Quan Bezzle,'' but that he ''took the charge'' because he did not want any of his family members to ''go down for it . . . .''

Natale then asked the defendant if he had ''hear[d] anything about any homicides.'' The defendant responded that he heard about the one that had just occurred ''on the Boulevard.'' The discussion then turned to the circumstances of the victim's murder. The defendant denied knowing anything about the homicide beyond what he had heard from media reports.

At this point, approximately twenty minutes into the interview, Natale's tone changed from conversational to accusatory. For the remainder of the first hour of questioning, Natale began employing the interrogation tactics that the defendant now complains of on appeal. She confronted the defendant with the ''evidence'' of his guilt, some of which she had fabricated. Natale falsely told the defendant that two individuals who witnessed the homicide identified him from a photographic array as the shooter. Natale emphasized this false evidence at least six times during the first hour of questioning. Natale also told the defendant, falsely, that fingerprints were found on the shell casings left at the scene of the shooting and speculated that they would

---

[16] The defendant has never contested the adequacy of the *Miranda* warnings provided to him at the start of the interview or earlier that morning while he was detained in the cruiser. Nor has the defendant ever claimed that he did not knowingly and voluntarily waive his rights on either occasion.

State *v.* Griffin

match the defendant's prints when the forensic testing was completed.[17]

In addition, Natale offered the defendant favorable scenarios that could have potentially diminished his culpability and emphasized the severity of the sentence that he could receive for murder. Natale suggested that she thought the defendant "might have just been in the wrong place at the wrong time." Natale later emphasized that the defendant would inevitably be charged with some form of murder and that "the only difference . . . depending on our conversation today . . . is felony murder or being in the wrong place at the wrong time murder. You could either be the shooter, or the person [who] sits there and doesn't know what the fuck was going on, and was just in the wrong place at the wrong time. . . . You potentially don't have a chance to go home for sixty-five years, depending on how the outcome of today goes between me and you . . . ." At one point, Natale told the defendant that the witnesses who identified him had indicated that a second person was with him and that "you could get yourself out of this mess . . . if you tell the truth" about who else was there.

Natale also brought up the defendant's family members, at one point telling him that, although she "probably ha[d] no say in this," "your mom and your sister are probably gonna go down for that gun as well," and "they're probably gonna do warrants for them. Especially [because] you haven't shed any light on what's been going on with this."

---

[17] Natale also confronted the defendant with actual evidence. She repeatedly referenced the defendant's having recently been "yapping [his] mouth" and "bragging" about his involvement in the homicide, an apparent reference to the confidential informant's telling Podsiad that the defendant had admitted his involvement in the homicide. See part I of this opinion. Natale also pointed out that the assault rifle found in his attic was the same type of firearm used in the shooting and that it could be tested to see whether it matched the shell casings found at the scene.

State *v.* Griffin

Despite Natale's tactics, the defendant continued to categorically deny any knowledge of the homicide for the entire first hour of questioning. He pushed back on Natale's false evidence ploys, telling her that he "want[ed] to meet these people" who had supposedly identified him, and that "there ain't none of my finger- prints" on the shell casings. When Natale emphasized the virtual inevitability that the defendant would "go down" for the murder and that he was facing a potential sixty-five year jail sentence, the defendant responded, "I guess I'll take it to trial then," and, "I gotta see how it play[s] out. Hope for the best, pray for the wors[t]." At around forty minutes into questioning, after Natale again brought up the phony identification witnesses, the defendant had the following exchange with Natale:

"[The Defendant]: . . . . I don't be around nobody. I don't do nothing. I don't [know] why people put me in this stuff. . . . I just came home six months ago. Now I'm caught up in fucking bullshit over . . . fuck- ing nothing. Excuse my language.

"Natale: That's why you should start talking. Tell me, what happened?

"[The Defendant]: I'm telling you the best I know.

"Natale: No, you're not. No, you're not. You're willing to go down for this by yourself?

"[The Defendant]: If that's what it takes. Innocent person go down gonna take a long time. I gotta do what I gotta do."

At approximately 11:30 a.m.—one hour into ques- tioning—Natale left the room. When she returned a few minutes later, the defendant asked whether, if he told "the truth about who did it," he could "get some type of protection . . . ." After Natale assured him that he could, the defendant told her that he witnessed "Quan Bezzle" shoot and kill the victim, and that Quan Bezzle

State *v.* Griffin

threatened to kill him if he ever told the police. As the defendant said this, he buried his face into his shirt and, as he admitted at trial, pretended to cry. The defendant then emotionally proclaimed that he initially had withheld this information because Quan Bezzle knows where he lives, and he did not want "nothing to happen" to his sister and little niece, who live with him. According to the defendant, after Quan Bezzle shot the victim, the defendant ran to a pharmacy[18] to retrieve his bicycle and then rode his bicycle home. This story included his riding his bicycle from the pharmacy back in the direction of the crime scene and past the victim's lifeless body.

The defendant continued to falsely accuse Quan Bezzle of the murder through nearly two additional hours of questioning, despite Natale's and Zaweski's repeatedly telling him that they knew his story was a lie. Natale and Zaweski continued to remind him of his false story regarding Quan Bezzle and the fingerprint evidence, and they also repeatedly asserted that Wright, whom they had not actually yet spoken to, had told them that she was present at the shooting and that the defendant was there also.[19] They also continued to offer alternative scenarios to the defendant, such as that he shot the victim but did so accidentally or in self-defense. In addition, they continued to emphasize the lengthy prison sentence that the defendant was likely to receive. At one point, Natale made an apparent reference to the death penalty:

"Natale: . . . Do you see all the . . . little things that are gonna go in the report, that are just gonna?

---

[18] At one point, the defendant claimed that he retrieved his bicycle from CVS Pharmacy. At another point, he said that he retrieved his bicycle from Walgreens.

[19] Wright subsequently did provide a statement to the police in which she implicated the defendant.

State *v.* Griffin

"[The Defendant]: I ain't do nothing.

"Natale: Fry you? They're gonna put you in the chair. You gotta at least admit that that story's crazy. Whether it's true or not, doesn't it sound silly?"[20] The defendant had no noticeable or audible response to this statement.

Nevertheless, the defendant stuck to his story that he was innocent and that Quan Bezzle had shot the victim, until approximately 1:30 p.m.—three hours into the interrogation. At that point, the defendant's attempts to fabricate stories about Quan Bezzle and about his whereabouts on the night of the murder, including how he had used his bicycle to ride home after Quan Bezzle shot the victim, had all fallen apart. The following colloquy demonstrates that, immediately prior to confessing, it became apparent that the defendant's multiple lies were crumbling:

"Zaweski: So, you go and you get your bike, and then where do you go?

"[The Defendant]: I go home.

"Zaweski: To where?

"[The Defendant]: Fair Haven.

"Zaweski: And how do you get there?

"[The Defendant]: My bike.

"Zaweski: I know on a bike. How do you, what roads [do] you take?

"[The Defendant]: I go up, um, I go up on the Boulevard. I go up Bellevue.

"Zaweski: Tell me, you did not just say that. How, how do you get home?

---

[20] At trial, the defendant testified that he had interpreted this statement as suggesting that he would receive the death penalty, specifically, the electric chair, if he did not confess. The defendant testified that he believed that such a sentence would have been possible if he were convicted.

State *v.* Griffin

"[The Defendant]: My bike.

"Zaweski: Yeah, what roads do you take?

"[The Defendant]: The Boulevard.

"Zaweski: Okay, so, you went back up past the crime scene?

"[The Defendant]: Mm-hmm.

"Zaweski: You didn't do that.

"Natale: Bobby, you getting tired?

"[The Defendant]: Yeah.

"Natale: 'Cause you're, you're, that's crazy.

"Zaweski: Seriously, you wanna tell us you took your bike back all the way uphill, past the dead guy lying in the street and all the cops that were right there?

"Natale: Bobby, open your eyes."

This conversation continued as the defendant stuck to his story that he rode his bicycle home but was unable to explain which roads he took home and why he rode past the crime scene. Natale commented, "[y]ou can't even keep up with your own lies . . . ." Zaweski then explained: "We're not trying to confuse you, alright, but you're confusing us. You understand that? Everything you're telling us is just not making any sense."

Natale then said: "And you need to figure out what is going on here. Because you are looking at sixty-five years alone. With no conspirator because Quan [Bezzle] did not shoot this guy. Figure it out. And it better be quick 'cause you're digging yourself deeper and deeper. Now you don't know if you're at your girl's house or your mom's house. You're just lying and lying and lying. Covering yourself up. Trying to get out of this. And you're not gonna get out of it. The only thing that you're

State *v.* Griffin

gonna do is make it better for yourself in the long run. That's the only thing you're gonna do. I could tell you're a mope. But, you're not a mope 'cause you can't even, you can't even lie. You can't even lie. Look at all the lies. Four pages of lies. You're not a criminal. You're not a killer. First you're at your sister's house. Then you're at CVS, then Walgreens. It, I mean just five pages of, I'm on my sixth page now of complete lies.''

A few minutes later, Natale said in relevant part: ''I don't think you have any idea of how serious this is. No clue. The choice is yours. Murder, manslaughter. That's your choice. That's what you're looking at. Right now, you're looking at murder, felony murder. Just [because] you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this story. We have too much against you. Too much against you . . . [for you] to sit here and stick with the story that you're telling us.''

The defendant then asked: ''So, how much time do I get for manslaughter?'' Natale responded: ''I wouldn't be worried about time right now. I'd be worrying about . . . what your end result story's gonna be. . . . You have to worry about telling the truth right now and coming clean.'' The defendant responded, ''[a]lright, I'll tell the truth,'' and proceeded to confess in detail to his role in the murder. He explained how he, Wright, and Johnson lured the victim to the scene and admitted that he shot the victim twice in the back while attempting to rob him but claimed that it ''was an accident,'' and that he ''didn't mean to shoot him twice. [He] didn't even press the trigger, actually.'' The officers concluded the interrogation shortly thereafter. The video recording depicted Natale ordering food for the defendant after the questioning ended, and the defendant eating the food that ultimately arrived.

Prior to trial, the defendant moved to suppress all evidence of the statements he made during the interro-

State *v.* Griffin

gation, citing what he claimed were the officers' coercive interrogation tactics, as well as his diminished ability to resist due to a lack of sleep. The trial court conducted an evidentiary hearing, at which the state introduced Zaweski's testimony, as well as the video recording and transcript of the interrogation. The defendant did not offer any evidence in support of his claims at the hearing.

With respect to the general tenor of the interrogation, the trial court found, on the basis of its review of the video recording, that "[the defendant] did not manifest any outward signs of intoxication. . . . The defendant at no point asked [Natale or Zaweski] to stop the interview and at no point asked to speak with an attorney. . . . The tenor of the questioning ranged from conversational to accusatory over the entire length of the interview . . . . The police remained seated during the entirety of the questioning, as did the defendant. The police did not stand up, display their weapons, or invade the 'personal space' of the defendant during their questioning. [Although] the police were at some points contentious in their questioning, at no point did the defendant's demeanor appear to change in response to the aggressive nature of the questioning. The defendant remained largely calm and low-key throughout the interview. He characterized himself, generally, as a 'calm' person. . . . The defendant appeared at ease contesting the accusations being made by the police during the interview . . . . He had no difficultly jousting with his interrogators. . . .

"There is no evidence before the court demonstrating that the defendant suffered from any mental or psychological infirmity, or was susceptible to coercion on the basis of age or education. The [video-recorded] interview demonstrates that the defendant had the capacity to understand his right against self-incrimination and seemed under control emotionally and psychologically.

State *v.* Griffin

The defendant, approximately three-quarters into the interview, was asked if he was tired because he closed his eyes. The defendant responded that he was tired, but . . . the remainder of the interrogation did not demonstrate any change in his response time to the questions being asked or his ability to logically communicate. His answers throughout the interview, including after the reference to his tiredness, uniformly had a contextual relationship to the questions being asked. He communicated coherently and rationally. He never manifested any confusion in his communications at any point in the interrogation.''

The trial court denied the defendant's motion to suppress in a memorandum of decision, concluding that the state had proven by a preponderance of the evidence that the defendant's statements were voluntary. In reaching this conclusion, the court began by noting that the defendant was advised of and waived his *Miranda* rights on two occasions prior to the interview, which diminished the coercive nature of the interview.

The court then addressed individually the tactics specifically complained of by the defendant, determining that they were not inherently coercive and/or were not in fact causally related to the defendant's decision to confess. First, the court concluded that the officers' false evidence ploys did not render the defendant's statements involuntary because the video recording of the interview demonstrated that this tactic was ''ineffectual'' on the defendant. The court found that the defendant ''demonstrated a large degree of self-savvy and assuredness,'' as evidenced by the fact that he concocted the Quan Bezzle artifice and ''calmly parried with the police in an effort to test their claims'' about the evidence they supposedly possessed against him.

Second, the court rejected the defendant's assertions that the officers coerced his statements with impermis-

sible minimization tactics or promises of leniency. The court reasoned that, although Natale and Zaweski mentioned lesser degrees of murder "that could be *available* in the event of an inculpatory statement," they gave him "no specific assurances that giving a statement would affect the manner or outcome of the criminal proceedings." (Emphasis in original.) Moreover, the court found that the officers' comments were not a "motivating cause of [the defendant's] confession."

Third, the court rejected the defendant's claim of impermissible threats of severe punishment. The court determined that, although Natale's reference to the death penalty was "plainly ill-advised," it did not "work to overbear the defendant's will to resist and was not causally related to his ultimate confession." The court noted that it was a "single, isolated" comment made approximately midway through the interview, the video recording demonstrated that it did not prompt any "overt reaction" by the defendant, and the defendant "continued to deny his involvement in the homicide until well after this single comment." Moreover, the court emphasized that, when the defendant did confess, "his voice was calm and deliberate . . . ."

Fourth, the court addressed Natale's comment that the defendant's mother and sister "are probably gonna go down for that gun," "[e]specially [because] you haven't shed any light on what's been going on" with the murder. The court acknowledged that the police "tread on dangerous ground" when they make such comments but ultimately found that Natale's comment "was insufficient to overbear the defendant's will to resist and was not causally related to his confession." The court noted that the defendant was already aware of his family's potential exposure for the rifle because he brought up the issue himself, without any prompting from Natale, at the start of the interview when he said he " 'took the charge' " for the rifle, so that his family

State *v.* Griffin

would not " 'go down for it . . . .' " The court found
that the defendant "responded dispassionately" and
appeared to have "brushed off" Natale's subsequent
comment, which "suggests that he recognized [it] as an
empty and vacuous ploy."

Finally, addressing the defendant's assertion that his
ability to resist was diminished by lack of sleep, the
trial court found, based on its review of the video
recording of the interrogation, that the defendant was
not "suffer[ing] from a lack of mental acuity or physical
infirmity as a result of a lack of sleep that rendered
his statement[s] involuntary." The court found that the
defendant never "manifested any outward signs [that]
suggest[ed] he did not understand the questions being
asked, [or] the purpose of the interview, or that his will
was overborne." To the contrary, the court found that
the defendant "had no problem jousting with the police
throughout the interview," was able to "communicate
clearly and coherently," and generally "demonstrated
a capacity to resist police accusations regarding the
homicide."

Accordingly, the court denied the defendant's motion
to suppress and admitted evidence of the defendant's
statements, including the video recording and transcript
thereof, at trial.

A

We begin with the defendant's claim under the federal
constitution. The defendant argues that the trial court
incorrectly determined that the police officers' coercive
tactics, coupled with his diminished capacity to resist
due to a lack of sleep, did not render his statements
involuntary. We are not persuaded.

The governing legal principles are well established.
"[T]he use of an involuntary confession in a criminal
trial is a violation of due process. . . . [T]he test of

State *v.* Griffin

voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded [in] a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . .

"It is well settled that [t]he state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence. . . . [As for the scope of our review] we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . .

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with

State *v.* Griffin

the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . [A]pplying the proper scope of review to the ultimate issue of voluntariness requires us . . . to conduct a plenary review of the record in order to make an independent determination of voluntariness.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 321–22, 96 A.3d 1199 (2014).

We emphasize at the outset that, insofar as the trial court's underlying factual findings were predicated on its review of the video recording of the interrogation, we nonetheless defer to those findings unless they are clearly erroneous. A trial court's findings are entitled to deference, even if they are predicated on documentary evidence that this court is equally able to review for itself on appeal, rather than on the credibility and demeanor of the testifying witnesses. See, e.g., *State* v. *Lawrence*, 282 Conn. 141, 157, 920 A.2d 236 (2007) ("it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations''); see also, e.g., *Skakel* v. *State*, 295 Conn. 447, 487 n.25, 991 A.2d 414 (2010) (rejecting proposition that "a less deferential standard [of review applies to] decisions pertaining to evidence that is not predicated on an assessment of the witness' demeanor''); *Besade* v. *Interstate Security Services*, 212 Conn. 441, 448–49, 562 A.2d 1086 (1989) (same). Accordingly, we are bound by the trial court's interpretation of what is reflected in the video recording unless it is clearly erroneous.[21] See, e.g., *State* v. *Weath-*

---

[21] This approach is consistent with that taken by the federal courts of appeals and many of our sister state courts. See, e.g., *United States* v. *McNeal*, 862 F.3d 1057, 1061–62 (10th Cir. 2017); *United States* v. *Murphy*, 703 F.3d 182, 188–89 (2d Cir. 2012); *United States* v. *Prokupek*, 632 F.3d 460, 462–63 (8th Cir. 2011); *Muniz* v. *Rovira-Martino*, 453 F.3d 10, 13 (1st Cir. 2006); *United States* v. *Navarro-Camacho*, 186 F.3d 701, 707–708 (6th

State *v.* Griffin

*ers*, 188 Conn. App. 600, 632, 205 A.3d 614 (2019) (holding that clear error review applies to trial court's finding, based on video recording, that defendant was not experiencing mental breakdown at time of crime), aff'd, 339 Conn. 187,      A.3d      (2021).

Turning to the substantive question of voluntariness, because the totality of the circumstances test "depend[s] [on] a weighing of the circumstances of pressure against the power of resistance of the person confessing"; (internal quotation marks omitted) *Dickerson* v. *United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); we begin by addressing the circumstances of the interrogation before turning to the defendant's personal characteristics and the extent to which they enabled him to resist the pressures imposed on him.[22]

Cir. 1999); *Robinson* v. *State*, 5 N.E.3d 362, 365–66 (Ind. 2014); *State* v. *Williams*, 334 S.W.3d 177, 180–82 (Mo. App. 2011); *State* v. *Elders*, 192 N.J. 224, 244–45, 927 A.2d 1250 (2007); *Montanez* v. *State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). But see, e.g., *People* v. *Hughes*, 3 N.E.3d 297, 312–13 (Ill. App. 2013), rev'd in part on other grounds, 69 N.E.3d 791 (Ill. 2015); *Commonwealth* v. *Novo*, 442 Mass. 262, 266, 812 N.E.2d 1169 (2004); *State* v. *Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).

[22] The concurrence and dissent purports to "begin with a more complete picture of the method employed in the defendant's interrogation . . . ." Part I of the concurring and dissenting opinion. Nevertheless, it is undisputed that, in determining whether a defendant's will was overborne, we are required to look at the totality of the circumstances, not just the behavior of the police. The concurrence and dissent makes no mention whatsoever of the multiple lies told by the defendant during the first three hours of the interrogation and, as a result, fails to address how the defendant's lies and his capacity to come up with them inform the question of whether his will was overcome by the officers.

Those are not the only facts that the concurrence and dissent neglects to present or address. There is also virtually no analysis of this defendant's personal characteristics (other than his race, which we will address separately), namely, his age at the time of the interrogation (twenty-one), education, or his experience with criminal proceedings, all of which are relevant to evaluating how the police tactics impacted this particular defendant. By leaving these facts out of the analysis and focusing nearly exclusively on the tactics used by the police, the concurrence and dissent ignores a necessary and crucial aspect of a proper analysis used to determine whether a defendant's will was overborne—to wit, the impact that the police tactics had on this defendant. See, e.g., *McCall* v. *Dutton*, 863 F.2d 454, 460 (6th

State *v.* Griffin

Applying this method, and having carefully reviewed
the video recording of the interrogation and transcript
thereof, we conclude that the trial court correctly deter-
mined that the state met its burden of establishing the
voluntariness of the defendant's statements by a pre-
ponderance of the evidence.

We observe, at the outset, that the defendant was
twice advised of his *Miranda* rights prior to being inter-
rogated: first, in the police cruiser outside of 374 Peck
Street, several hours before the interview, and second
at the start of the interview with Natale and Zaweski.
See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 734, 678 A.2d
942 (provision of *Miranda* rights "is relevant to a finding
of voluntariness"), cert. denied, 519 U.S. 994, 117 S. Ct.
484, 136 L. Ed. 2d 378 (1996). On both occasions, the
defendant indicated that he understood his rights and
nonetheless waived them and agreed to speak with
the police.

The provision of adequate *Miranda* warnings is sig-
nificant in our analysis because it has a bearing on both
sides of the voluntariness calculus: "It bears on the
coerciveness of the circumstances, for it reveals that

Cir. 1988) (when police yelled and pointed guns at accused, court ruled
that, because defendant was educated, remained calm, waived his *Miranda*
rights and accused someone else of committing crime, "even if [the defen-
dant] had proved police coercion, he would still not prevail because the
alleged 'coercion' was simply insufficient to overbear the will of the [defen-
dant]"), cert. denied, 490 U.S. 1020, 109 S. Ct. 1744, 104 L. Ed. 2d 181 (1989).
    Instead, the concurrence and dissent intimates that the mere use of these
tactics at any point in the interrogation is sufficient to conclude that the
defendant's will was overborne by them. This is not sufficient. Instead, it
must be shown "that his will was overborne *because* of the coercive police
activity in question. If the police misconduct at issue was not the 'crucial
motivating factor' behind [the defendant's] decision to confess, the confes-
sion may not be suppressed." (Emphasis in original.) Id., 459. We understand
the concurrence and dissent's palpable disdain for the police tactics used
in this case; some of those tactics we also question. The flaw in the concur-
rence and dissent's position, however, is the sole focus on the police tactics
to the exclusion of the other circumstances of the interview and the charac-
teristics of this defendant.

State *v.* Griffin

the police were aware of the suspect's rights and presumably prepared to honor them. And . . . it bears [on] the defendant's susceptibility, for it shows that the defendant was aware he had a right not to talk to the police.'' 2 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 6.2 (c), p. 712; see, e.g., *Berkemer* v. *McCarty*, 468 U.S. 420, 433, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (purpose of *Miranda* warning is to ''ensure that the police do not coerce or trick captive suspects into confessing . . . [and] to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist'' (emphasis omitted; footnote omitted; internal quotation marks omitted)); *State* v. *Correa*, 241 Conn. 322, 338, 696 A.2d 944 (1997) (''[a] [*Miranda*] warning at the time of the interrogation is indispensable to overcome its pressures and to [e]nsure that the individual knows he is free to exercise the privilege at that point in time'' (internal quotation marks omitted)). Therefore, the United States Supreme Court repeatedly has recognized that, although ''compliance with *Miranda* [does not] conclusively [establish] the voluntariness of a subsequent confession . . . cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'' (Internal quotation marks omitted.) *Berkemer* v. *McCarty*, supra, 433 n.20; see, e.g., *Evans* v. *Dowd*, 932 F.2d 739, 742 (8th Cir.) (''the [*Miranda*] warnings were part of the totality of the circumstances and, thus, it would be difficult to conclude that the police coerced the confession while at the same time warning [the defendant] that he need not say anything''), cert. denied, 502 U.S. 944, 112 S. Ct. 385, 116 L. Ed. 2d 335 (1991).

We are unconvinced that this is one of those rare cases. We disagree with the defendant that the circum-

State *v.* Griffin

stances of the interrogation were so coercive as to overbear his will. The defendant takes issue with the following four interrogation tactics utilized throughout the interrogation by Natale and Zaweski: (1) false evidence ploys; (2) maximizing the consequences of not confessing; (3) threatening the defendant's family with arrest; and (4) suggesting that confessing would be met with leniency.[23] We agree with the trial court that the record demonstrates that the combined effect of these tactics did not cause the defendant's will to be overborne.

First, it is undisputed that Natale and Zaweski repeatedly referenced evidence that they did not have in order

[23] Natale and Zaweski employed a series of interrogation tactics from the Reid Technique. The Reid Technique is a method of interrogation pioneered by John E. Reid and Associates. The concurrence and dissent spends a great deal of time discussing and criticizing the Reid Technique. The concurrence and dissent cites to scholarly criticisms of this technique; see part I B of the concurring and dissenting opinion; while also acknowledging that the technique, in and of itself, is not illegal. See part II of the concurring and dissenting opinion. We are unaware of any federal cases, addressing voluntariness under the fourth amendment, that have deemed the Reid Technique illegal or impermissible to employ. We do, however, agree with the observations of the United States District Court for the District of Rhode Island, which noted that there is valid criticism of the technique; see *United States* v. *Monroe*, 264 F. Supp. 3d 376, 392–94 (D.R.I. 2017); and that "it is not difficult to imagine circumstances [in which], depending on how the Reid Technique is employed or misemployed on a juvenile or an individual with an intellectual disability, the tactics would have an impermissible, coercive effect." Id., 393 n.153. The defendant here falls into neither of those vulnerable categories, and we reject the concurrence and dissent's attempt to treat black males, including the defendant here, as if they either fall into one of these categories or should be treated as if they do.

Furthermore, the concurrence and dissent cites to *State* v. *Baker*, 147 Haw. 413, 433–35, 465 P.3d 860 (2020), as an example of a court that found that police use of multiple coercive interrogation techniques in conjunction with each other rendered the defendant's statement involuntary. See part I B of the concurring and dissenting opinion. Despite its reliance on some federal case law, the Hawaii Supreme Court also relied on its state specific case law; see *State* v. *Baker*, supra, 433–35; and, more importantly, concluded that the admission of the defendant's statement violated his *state* constitutional rights. See id., 435 ("the admission of the statement at trial violated [the defendant's] right against self-incrimination under [article one, § 10, of the Hawaii] [c]onstitution").

State *v.* Griffin

to give the impression that their case against the defendant was stronger than it actually was. The defendant specifically notes that they falsely claimed that two eyewitnesses to the murder had identified the defendant as the shooter, that fingerprints were found on the shell casings left at the scene of the shooting, and that Wright had given a statement that incriminated the defendant.

In *State* v. *Lapointe*, supra, 237 Conn. 694, this court held that a defendant's incriminating statement had not been obtained involuntarily when the police falsely represented that his fingerprints were found on the handle of the knife used to murder the victim. Id., 731–32. This court observed: "Such statements by the police designed to lead a suspect to believe that the case against him is strong are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." Id., 732. This court has repeated this observation in subsequent cases. See, e.g., *State* v. *Lawrence*, supra, 282 Conn. 176; *State* v. *Pinder*, 250 Conn. 385, 423, 736 A.2d 857 (1999). The defendant asks us to overrule or limit this aspect of *Lapointe*, not necessarily to "completely prohibit the use of ruses and ploys in interrogations," but, instead, to "discourage the practice by concluding that false statements about evidence, combined with other coercive tactics," may undermine a defendant's will.

Although we do not interpret *Lapointe* as suggesting that false evidence claims can never contribute to the involuntariness of a confession, we take this opportunity to emphasize that misrepresentations by interrogating officers about the strength of their case against a defendant can, under certain circumstances, add to the coercive nature of an interrogation. We decline at this time, however, to categorically condemn the use of such tactics or to adopt any bright-line rules as to their likely impact on the voluntariness of a confession.

State *v.* Griffin

The impact of false evidence ploys, if any, must instead be assessed in light of the totality of the circumstances, including the presence or absence of other coercive circumstances and the personal characteristics of the defendant. See, e.g., *United States* v. *Byram*, 145 F.3d 405, 408 (1st Cir. 1998) (noting that certain lies can be coercive depending on type of lie and circumstances); *State* v. *Lawrence*, supra, 282 Conn. 176 ("[i]t is well established . . . that although some types of police trickery can entail coercion . . . trickery is not automatically coercion" (internal quotation marks omitted)); *People* v. *Thomas*, 22 N.Y.3d 629, 642, 8 N.E.3d 308, 985 N.Y.S.2d 193 (2014) ("It is well established that not all deception of a suspect is coercive, but in extreme forms it may be. Whether deception or other psychologically directed stratagems actually eclipse individual will, will of course depend [on] the facts of each case, both as they bear [on] the means employed and the vulnerability of the declarant.").

In the present case, we agree with the trial court that, in light of the totality of the circumstances, the officers' false evidence ploys did not cause the defendant's will to be overborne. Most of the false evidence claims— particularly the claims about the identifying witnesses and fingerprint evidence—were made during the first hour of the interview and were not particularly egregious. The defendant demonstrated that he was perfectly capable of pushing back on these claims. He told Natale that he "want[ed] to meet these people" who had supposedly identified him and that "there ain't none of my fingerprints" on the shell casings. At one point, the defendant indicated, "I guess I'll take [the case] to trial then," and that he wanted to "see how it play[s] out. Hope for the best, pray for the wors[t]."

Most telling, one hour into the interview, the defendant falsely accused Quan Bezzle of committing the murder, even pretending to cry in order to make his

State *v.* Griffin

story seem more believable. The defendant maintained this fabricated story for two more hours, despite the officers' continued emphasis on the false evidence. This type of resistant conduct is strong evidence that the defendant's will to resist was not subverted by his interrogators' ploys. See, e.g., *State* v. *Correa*, supra, 241 Conn. 337 ("If the defendant's will was overborne, it is highly unlikely that he would have signed a statement in which he accused another individual of being the killer. The defendant's consistent claims that he had not been involved in the crimes provide strong evidence that his will was not overborne by any police tactics.").

Second, the defendant contends that Natale and Zaweski repeatedly exaggerated the consequences if the defendant did not confess. The defendant relies on the repeated instances in which the officers told the defendant that he could be sentenced to sixty-five years imprisonment or spend the rest of his life in jail. Our review of the video recording of the interrogation discloses at least seven such statements. Further, approximately two and one-half hours into the interview, Natale had the following exchange with the defendant while confronting him with the implausibility of his claims of innocence:

"Natale: . . . Do you see all the . . . little things that are gonna go in the report, that are just gonna?

"[The Defendant]: I ain't do nothing.

"Natale: Fry you? They're gonna put you in the chair. You gotta at least admit that that story's crazy. Whether it's true or not, doesn't it sound silly?"

We disagree that these statements rendered the defendant's confession involuntary. The officers' statements that he was facing sixty-five years in prison were not impermissible because his potential exposure far exceeded that. Indeed, the trial court ultimately imposed

State *v.* Griffin

a total effective sentence of ninety years imprisonment without the possibility of release, consisting of sixty years for murder, twenty years for conspiracy to commit robbery in the first degree, and ten years for criminal possession of a firearm, all running consecutively. Accordingly, we cannot conclude that the officers' statements regarding the defendant's potential exposure were unduly coercive because they were an accurate representation of the severity of the consequences that the defendant was facing. See, e.g., *United States* v. *Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (concluding that police's statement to defendant that his "children would be driving by the time he would be released from prison" was "an accurate [representation] of [the defendant's] predicament" and, therefore, "not unduly coercive" (internal quotation marks omitted)); *United States* v. *Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth [are] no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government" (internal quotation marks omitted)).

We also agree with the trial court that Natale's apparent reference to the death penalty did not cause the defendant's will to be overborne. Although we view this statement as inappropriate, as the trial court found, the comment was a single, isolated statement made approximately two and one-half hours into the interrogation. It was never referenced again, and Zaweski quickly changed the subject to more mundane details about the defendant's mode of transportation on the night of the murder. The defendant had no audible reaction to the comment and continued his attempts to pin the murder on Quan Bezzle well after the statement was made.

Third, the defendant contends that Natale made impermissible threats that the defendant's family would be arrested if he did not confess. Specifically, Natale said that, although she "probably ha[d] no say in this," "they're probably gonna do warrants for them. Especially [because] you haven't shed any light on what's been going on with this." We agree with the trial court that the coercive impact of this statement is somewhat diminished in light of the fact that it was the defendant who had previously brought up the potential of his family's criminal exposure for the rifle, thereby indicating that he already was aware of the issue prior to Natale's comment. At the very least, however, Natale's comment apparently was intended to exploit and play on the defendant's previously expressed concern. We therefore do not condone it and acknowledge that such tactics can provide a basis for concluding that a confession is involuntary.

Ultimately, however, we agree with the trial court that this single comment was not causally related to the defendant's confession. As the trial court found, the defendant "responded dispassionately" and appeared to have "brushed off" Natale's comment, which "suggests that he recognized [it] as an empty and vacuous ploy." Further, Natale made the comment very early in the interrogation, and the defendant denied his involvement and blamed Quan Bezzle for more than two hours after this comment was made. See, e.g., *State* v. *Correa*, supra, 241 Conn. 338 (rejecting claim that police statements about immigration status of defendant's family and purported contract on defendant's life overcame his will when "[t]he defendant reacted calmly when these statements were made and exhibited no signs of duress," and "[i]t was several hours later before the defendant himself initiated a statement seeking to exculpate himself and to inculpate [a third party]").

State *v.* Griffin

Finally, the defendant contends that the officers engaged in impermissible minimization and suggested that he would receive leniency in exchange for confessing. The video recording and transcript reveal that Natale and Zaweski made a number of such statements throughout the interview. At one point, Natale told the defendant that he would inevitably be charged with some form of murder, and that "the only difference . . . depending on our conversation today . . . is felony murder or being in the wrong place at the wrong time murder. You could either be the shooter, or the person [who] sits there and doesn't know what the fuck was going on, and was just in the wrong place at the wrong time. . . . You potentially don't have a chance to go home for sixty-five years, depending on how the outcome of today goes between me and you . . . ."

On another occasion, Natale said, "you could get yourself out of this mess . . . if you tell the truth . . . ." Later in the interview, Zaweski said: "[I]f you wanna spend the rest of your life in prison and sit there and keep your mouth shut, that's fine. But if you wanna salvage some years later on or explain to people, explain to your mom, that this isn't who you really are. It was an accident. You made a mistake. This is the time you have to do that."

Lastly, just before the defendant confessed to shooting the victim, Natale said: "The choice is yours. Murder, manslaughter. . . . Right now, you're looking at murder, felony murder. Just [because] you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this story." The defendant responded by asking, "[s]o, how much time do I get for manslaughter?" Natale responded: "I wouldn't be worried about time right now. I'd be worrying about . . . what your end result story's gonna be. . . . You have to worry about telling the truth right now and coming clean." The defendant then said, "[a]lright, I'll

State *v.* Griffin

tell the truth,'' and confessed to having shot the victim, though he claimed he did so accidentally.

This court previously has explained: ''[When] [t]he defendant was given no specific assurances that giving a statement would affect the outcome of the criminal proceedings . . . [e]ncouraging a suspect to tell the truth . . . does not, as a matter of law, overcome a confessor's will . . . . Neither is a statement that the accused's cooperation will be made known to the court sufficient inducement so as to render a subsequent incriminating statement involuntary. . . . Several courts have held that remarks of the police far more explicitly indicating a defendant's willingness to make a statement would be viewed favorably do not render his confession involuntary. . . . [A] statement [that the accused's cooperation would be to his benefit] by a law enforcement officer falls *far* short of creating the compelling pressures which work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely.'' (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Pinder*, supra, 250 Conn. 424.

Although Natale's comments purported to encourage the defendant to ''tell the truth'' and even suggested that he could be charged with the lesser crime of manslaughter depending on the statement he gave, neither Natale or Zaweski ever definitively promised the defendant that he would be charged only with manslaughter if he confessed, or that he would receive a lesser sentence for doing so. Nor did the officers ever represent that they had the authority to determine the offense he was charged with, or that the penalties that attach to manslaughter were not severe. Such vague, predictive suggestions that a confession could potentially benefit the defendant or cause a fact finder to view him more

State *v.* Griffin

favorably are not inherently coercive.[24] See, e.g., *United States* v. *Jackson*, 608 F.3d 100, 103 (1st Cir.) ("a suggestion that cooperation might induce leniency" does not amount to coercion), cert. denied, 562 U.S. 990, 131 S. Ct. 435, 178 L. Ed. 2d 337 (2010); *Commonwealth* v. *O'Brian*, 445 Mass. 720, 725, 727, 840 N.E.2d 500 (detective's comment that shooting could have been accident did not render defendant's confession involuntary under totality of circumstances, and detective's comment that he would bring defendant's cooperation to prosecutor's attention and that defendant " 'may see the light of day down the road' " did not "coerce the defendant into confessing because the detective did not promise a lesser sentence and did not hold himself out as possessing the authority to enter into a plea with, or reduce the charges for, the defendant"), cert. denied, 549 U.S. 898, 127 S. Ct. 213, 166 L. Ed. 2d 171 (2006).[25]

---

[24] The concurrence and dissent focuses on the following statement by Natale: "The choice is yours. Murder, manslaughter. That's your choice." The concurrence and dissent asserts that the statement "was not simply a case in which the interrogators falsely indicated that the defendant's confession to an accidental shooting would result in a manslaughter charge, when the choice of charges actually would be a matter left entirely to the prosecutor's discretion (i.e., misrepresentation of fact). Rather, the interrogators affirmatively misled the defendant by telling him that the accident/self-defense narrative proposed to him was relevant and material to his criminal exposure for felony murder, which was untrue as a matter of law." (Emphasis omitted.) Footnote 18 of the concurring and dissenting opinion. This is clearly a stretch. It strains credulity to think that the officers were telling the defendant that he could decide which charges to levy against himself as opposed to telling him that it was his choice whether to tell the truth. Of course, the defendant himself, who had significant, prior experience with the criminal justice system and also testified in this case, never alleged that he interpreted the officers' comments in this way. Furthermore, although the prosecutors could still charge the defendant with felony murder, even if the defendant claimed that the shooting was accidental or in self-defense, the prosecutors could consider that factor when choosing whether to charge the defendant with felony murder.

[25] The concurrence and dissent asserts that Natale's "implied promise that the defendant's confession could result in only a manslaughter charge . . . plainly was the tipping point for the defendant . . . ." Part II of the concurring and dissenting opinion. We disagree with the concurrence and dissent's conclusion that this comment "plainly was the tipping point . . . ." Id.

State *v.* Griffin

Additional circumstances of the interrogation lead us to conclude that the officers' tactics, even when considered in combination with each other, did not cause the defendant's will to be overborne. The length of the interrogation that led to his confession—approximately three hours—is far shorter than other interrogations held not to have been inherently coercive. See, e.g., *State* v. *DeAngelis*, 200 Conn. 224, 233, 235, 511 A.2d 310 (1986) (ten and one-half hour interview did not necessarily mean that defendant's admissions were involuntary); *State* v. *Carter*, 189 Conn. 631, 637–38, 458 A.2d 379 (1983) (eight hour detention and interview, "though substantial in duration, does not remotely approach the length of those interrogations held to be so objectionable on that ground . . . as to warrant reversal of a finding by a trial court that a confession was voluntary"); see also, e.g., *Berghuis* v. *Thompkins*, 560 U.S. 370, 387, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) ("there is no authority for the proposition that an interrogation [that lasted three hours] is inherently coercive"). There also were three three to ten minute periods, approximately every hour, when either one or both of the officers left the room and the questioning ceased.

Additionally, during the interrogation, Natale and Zaweski never subjected the defendant to actual physical abuse or threats of such abuse. Although their tones ranged from conversational to accusatory throughout the interrogation, they both remained seated at all times. They never invaded the defendant's personal space, displayed their weapons or engaged in any other acts of intimidation. Nor did the defendant ever ask for

Instead, we focus on how all of these tactics affected this particular defendant and his will to resist based on the totality of the circumstances. See *Dickerson* v. *United States*, supra, 530 U.S. 434 (totality of circumstances test "depend[s] [on] a weighing of the circumstances of pressure against the power of resistance of the person confessing" (internal quotation marks omitted)).

State *v.* Griffin

a break or for the questioning to cease for any reason, make any suggestion that he wanted to invoke his right to silence, or ask for an attorney.

The video recording also provides evidence that the tactics of the interrogators did not affect the demeanor of the defendant, who was familiar with the criminal justice system. The trial court found in relevant part: "[Although] the police were at some points contentious in their questioning, at no point did the defendant's demeanor appear to change in response to the aggressive nature of the questioning. The defendant remained largely calm and low-key throughout the interview. He characterized himself, generally, as a 'calm' person. . . . The defendant appeared at ease contesting the accusations being made by the police during the interview . . . . He had no difficultly jousting with his interrogators."

The concurrence and dissent asserts that "[t]his view conforms to case law that implicitly assumes that a person's external demeanor provides a reliable indication of his or her internal emotional state during an interrogation, and, thus, a calm demeanor suggests the absence of coercion. This unexamined assumption strikes me as dubious at best. We now know that a subject's external appearance may not accurately reflect his or her internal reality." Footnote 21 of the concurring and dissenting opinion. The concurrence and dissent relies on law review articles and studies that are not in the record to argue that the trial court was not situated "to know what psychological, emotional, and cultural factors actually lay behind this defendant's calm demeanor." Id.

It is undisputed, however, that "[a] defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary." *United States* v. *Jacques*, 744 F.3d 804, 809 (1st Cir.), cert. denied,

State *v.* Griffin

574 U.S. 853, 135 S. Ct. 131, 190 L. Ed. 2d 100 (2014). The concurrence and dissent seems to assert that a fact finder cannot make inferences from the demeanor of a witness, which is contrary to the well established principle that "[a]n appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; [thus, the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 155. Accordingly, although we are mindful that sometimes one's demeanor can be impacted by psychological, social and cultural factors, that does not mean that one's demeanor cannot be considered at all by a fact finder. Demeanor can be considered as *a factor* in assessing the totality of the circumstances. The inferences drawn from one's demeanor may vary depending on the individual witness or party and the particular circumstances of the case. In this case, we cannot conclude that the trial court erred in making the inference that the defendant's calm demeanor was one factor demonstrating that the defendant's will was not overborne by police tactics.

Perhaps more fundamental, the concurrence and dissent's bald assertion that the defendant's calm and low-key demeanor is consistent with "a substantial body of literature indicating that it is not uncommon for individuals growing up in a violent home or neighborhood, as the defendant in the present case did, to adopt a mask of unemotional fearlessness as a coping mechanism"; footnote 21 of the concurring and dissenting opinion; is belied by the very facts of this interview. The concurrence and dissent explains that the masking behavior is used as a way to show bravado and to avoid vulnerability. See id. But the defendant did just the opposite for a large part of the interview.

State *v.* Griffin

If the defendant was ever one of those mask wearing individuals of which the concurrence and dissent speaks, he certainly had no problem shedding that mask when he tried to show fear and vulnerability as he told the Quan Bezzle lie during the interview. He went as far as pretending to cry and telling the officers that he was afraid of Quan Bezzle. The concurrence and dissent does not acknowledge that this defendant either does not fit the concurrence and dissent's picture of someone who wears a "mask of unemotional fearlessness"; id.; or that, even if he did at some point, he shed the so-called mask when he cried and proclaimed fear of Quan Bezzle. By doing so, the concurrence and dissent shows its hand—it does not consider this particular defendant, as is required, and, instead, focuses on the potential, theoretical impact of police tactics on a generalized group of defendants.

Indeed, the defendant's tears and his expression of fear of Quan Bezzle strongly weigh against the concurrence and dissent's theory that this defendant's calm and low-key demeanor was just a coping mechanism. Instead, the defendant's ability to feign an emotional outburst and then return to his calm and low-key demeanor demonstrates that he was in total control of his emotions during the interrogation. Whatever the merit of the concurrence and dissent's tangential argument about what some "individuals [who grow] up in a violent home or neighborhood";[26] id.; do to mask their

---

[26] Although the concurrence and dissent connects this phenomenon of masking with growing up in violent homes or neighborhoods, the majority of the sources on which the concurrence and dissent relies appear to connect this phenomenon to race and gender—particularly black males. We reject the concurrence and dissent's invitation to apply these race and gender based overgeneralizations to this particular defendant. Instead, we choose to believe the defendant, who not only cried during the interview, but also described himself as, generally, a calm person. Presumably, the defendant knows himself best, notwithstanding the concurrence and dissent's generalizations about males, particularly black males. To be clear, this defendant never claimed at any point in this case—not at the suppression hearing, in his testimony at trial, at the sentencing hearing, in his appellate brief or

State *v.* Griffin

emotions, this defendant certainly did not fit that paradigm in the police interview at issue in this case.[27]

Thus, although the concurrence and dissent packages its position as trying to appreciate the plight of individuals who grow up in a violent home or neighborhood, by painting with such a broad brush, the concurrence and dissent's position perpetuates gross overgeneralizations, instead of looking at the individual characteristics of this particular defendant, an individual who freely showed some emotion and fear during the police interview.

Indeed, the record also does not support the defendant's claim that his personal characteristics rendered him especially susceptible to coercion. The defendant was twenty-one years old at the time of his interview. He was gainfully employed full-time as a chef at Chipotle, was in the process of obtaining his GED, and

at oral argument before this court—that he wore a mask of unemotional fearlessness. See footnote 21 of the concurring and dissenting opinion.

[27] The concurrence and dissent asserts that "one of the officers said to the defendant, well into the interrogation, 'I think you're putting a tough guy front on' . . . ." Footnote 21 of the concurring and dissenting opinion. A review of the following colloquy between the defendant and Natale reveals that Natale's comment related to a conversation about whether the defendant had been sleeping:

"Natale: I bet you haven't even slept all week, have you?

"[The Defendant]: Yeah.

"Natale: You have?

"[The Defendant]: I slept.

"Natale: You slept good, after being involved in a murder?

"[The Defendant]: [No response heard].

"Natale: I don't think you have. I think you're putting a tough guy front on.

"[The Defendant]: No, I did. I slept good."

Based on the foregoing, contrary to the concurrence and dissent, we would not conclude that this one comment related to whether the defendant was sleeping, made in the course of an approximately three hour interview, means that the record in the present case supports the concurrence and dissent's hypothesis that the defendant's calm, low-key demeanor was the result of "a mask of unemotional fearlessness" when we consider the entire interview, as we are required to do.

State *v.* Griffin

planned to pursue college degrees in culinary arts and business management. There was no evidence presented, either at the suppression hearing or at trial, to suggest that the defendant was not of normal intelligence.[28] Such characteristics, coupled with the valid *Miranda* warnings twice provided and waived by him prior to any questioning, provide strong support for a finding of voluntariness. See, e.g., *State* v. *Ramos*, 317

[28] The defendant and the concurrence and dissent rely on a psychological evaluation report that the defendant submitted to the court at his sentencing hearing as support for his claim that he was susceptible to coercion. See footnote 20 of the concurring and dissenting opinion. This was not the presentence investigation report but, instead, a report from a psychologist hired by the defendant. The report states that cognitive tests revealed that the defendant had a low average intelligence quotient (IQ) of between 80 and 85, had "mild intellectual impairments," and had a "tendency to cede to authority or to social pressure." The state contends that this court cannot consider the assertions in this report in determining whether the defendant's statements were voluntary because the report was submitted at the defendant's sentencing hearing rather than at trial or at the suppression hearing. It is by now well settled that, "in order to determine whether the defendant's constitutional rights have been infringed, [w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quotation marks omitted.) *State* v. *Edwards*, 299 Conn. 419, 439 n.16, 11 A.3d 116 (2011). However, at the sentencing hearing, the trial court concluded that "[the defendant's] conduct during this crime and the aftermath of the crime, in the court's view, clearly contradicts and undermines [the psychologist's] statements that the defendant, in his words, was likely to be nonassertive and adapt socially to his surroundings. He certainly did not [cede] control to other people based on the court's view of the credible evidence that was presented." The sentencing court placed no temporal limitation on what it meant by the "aftermath of the crime," and it considered all of the evidence at the trial. As this court has explained, appellate review of the record in connection with a constitutional claim "must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state *but that the trial court did not expressly discredit.*" (Emphasis added.) *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016). Accordingly, because the trial court expressly rejected the psychologist's conclusion that the defendant was likely to be nonassertive, adapt socially to his surroundings and cede control to other people, we do not consider it on appeal in assessing the voluntariness of the defendant's statements. We can find no basis for the concurrence and dissent's reliance on allegations by the defendant that were rejected by the trial court at the sentencing hearing.

State *v.* Griffin

Conn. 19, 32–33, 114 A.3d 1202 (2015) (Confession was voluntary when ''[t]he defendant was forty-three years old at the time of his confession. He had obtained his [GED] certificate, was able to read, and was twice read his *Miranda* rights by [the police]. The defendant appeared calm and cooperative throughout his interview. Once he received his *Miranda* warnings, he stated repeatedly that he understood his rights and the implications of waiving them.''); *State* v. *Pinder*, supra, 250 Conn. 425 (rejecting argument that defendant was ''susceptible to coercion by the police'' when defendant ''was twenty years old, apparently had completed high school,'' ''was gainfully employed as a car salesman,'' and expert witness testified that defendant ''was of normal intelligence'').

As we noted previously in this opinion, the defendant was not a novice to the criminal justice system. He had multiple prior felony convictions and, at the time of his interrogation, had only recently been released from serving a two and one-half year sentence of incarceration. This prior experience suggests not only that the defendant was well equipped to retain his ''capacity for self-determination''; (internal quotation marks omitted) *State* v. *Andrews*, supra, 313 Conn. 321; in the face of coercive or deceptive police tactics, but also that he fully understood the nature of his *Miranda* rights and the consequences of waiving (or never invoking) them. Compare *State* v. *Madera*, 210 Conn. 22, 45, 554 A.2d 263 (1989) (defendant's ''prior exposure to the criminal justice system, due to some seventeen prior arrests,'' was relevant to ''his knowledge of his [*Miranda*] rights,'' as well as to whether interrogation tactics had overborne his will), with *People* v. *Thomas*, supra, 22 N.Y.3d 642 (coercive interrogation tactics ''were manifestly lethal to self-determination when deployed against [the] defendant, an unsophisticated individual without experience in the criminal justice system'').

State *v.* Griffin

We also disagree that the record supports the defendant's claim that he was rendered especially susceptible to coercion due to lack of sleep. It is well settled that "tiredness, or even exhaustion, does not compel the conclusion that [the defendant's] will was overborne or [his] capacity for self-determination critically impaired." (Internal quotation marks omitted.) *United States* v. *Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016), cert. denied,    U.S.    , 137 S. Ct. 1597, 197 L. Ed. 2d 723 (2017); see, e.g., *State* v. *Pinder*, supra, 250 Conn. 425 (fact that defendant had mental deficiency or was upset emotionally "[does not] necessarily render his statements inadmissible" (internal quotation marks omitted)).

Moreover, the trial court specifically found, on the basis of its review of the video recording of the interrogation, that the defendant did not "[suffer] from a lack of mental acuity or physical infirmity as a result of a lack of sleep . . . ." Such a factual finding defeats the defendant's claim that his lack of sleep contributed to the involuntariness of his confession because "[a] diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." (Internal quotation marks omitted.) *United States* v. *Salameh*, 152 F.3d 88, 117 (2d Cir. 1998), cert. denied sub nom. *Abouhalima* v. *United States*, 525 U.S. 1112, 119 S. Ct. 885, 142 L. Ed. 2d 785 (1999), and cert. denied, 526 U.S. 1028, 119 S. Ct. 1273, 143 L. Ed. 2d 368 (1999), and cert. denied sub nom. *Ayyad* v. *United States*, 526 U.S. 1028, 119 S. Ct. 1274, 143 L. Ed. 2d 368 (1999), and cert. denied sub nom. *Ajaj* v. *United States*, 526 U.S. 1044, 119 S. Ct. 1345, 143 L. Ed. 2d 508 (1999); see, e.g., *United States* v. *Calvetti*, supra, 836 F.3d 664 (defendant's claim that she was tired did not render her statements involuntary when "nothing in the record suggest[ed] she was vulnerable as a result").

State *v.* Griffin

After a review of the video recording, we conclude that the trial court's finding was reasonable and, thus, not clearly erroneous. Although the defendant showed signs of being tired during the interview and appeared to begin to doze off whenever the officers would leave the interrogation room, the defendant's performance during the interrogation supports the trial court's finding that such a condition did not diminish his ability to resist. As the trial court found, the defendant was lucid and responsive throughout the interview, was able to understand the officers' questions, and communicated clearly and coherently. In addition, the defendant had the wherewithal to push back at the officers' interrogation tactics, consistently denying his involvement in the shooting, concocting the lie that Quan Bezzle committed the murder and maintaining that lie for multiple hours, and even pretending to cry to give credibility to his story. This was not delirium; by the defendant's own admission, it was calculated. These facts undercut any claim that the defendant's lack of sleep diminished his ability to resist. See, e.g., *State* v. *DeAngelis*, supra, 200 Conn. 234 ("[the officer] was aware that the defendant had said that he had not slept the night before, but he testified [that] the defendant appeared fresh and alert throughout the questioning"); *State* v. *Carter*, supra, 189 Conn. 638 ("despite some sleepiness observed near the end of the conversation with the police, [the defendant] was alert and responsive").

In sum, the totality of the circumstances convinces us that "the defendant did not confess because his will . . . was overborne, but rather that he confessed of his own free will because he believed it would be in his best interest to do so." *State* v. *James*, 237 Conn. 390, 428, 678 A.2d 1338 (1996). Accordingly, we conclude that the state proved the voluntariness of the defendant's statements by a preponderance of the evidence

State *v.* Griffin

and that their admission at trial did not violate the due process clause of the federal constitution.

B

Finally, the defendant contends that, even if his confession is voluntary under the federal constitution, we should "set a higher standard under [our] state case law." Specifically, the defendant asks us to "create a prophylactic constitutional rule requiring trial courts to strongly consider whether [the coercive tactics used in this case] raise questions about the voluntariness of a confession." The defendant relies on the settled proposition that "the federal constitution sets the floor, not the ceiling, on individual rights"; *State* v. *Purcell*, 331 Conn. 318, 341, 203 A.3d 542 (2019); and contends that such a step is warranted in light of the multifactor test set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

"In construing the Connecticut constitution to determine whether it provides our citizens with greater protections than the federal constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, supra, 222 Conn. 684–85]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]." (Internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 50, 225 A.3d 668 (2020).

We conclude that a review of the *Geisler* factors does not support the defendant's claim that we should adopt a prophylactic constitutional rule requiring trial courts to strongly consider whether coercive tactics raise questions about the voluntariness of a confession. First, the

State *v.* Griffin

text of the state due process clause does not support
the defendant's claim. See, e.g., *State* v. *Lockhart*, 298
Conn. 537, 551–52, 4 A.3d 1176 (2010) (concluding that
similarity between text of federal and state due process
clauses supports "a common interpretation of the provi-
sions" (internal quotation marks omitted)); see also
footnotes 7 and 8 of this opinion. Second, the defendant
fails to point to any Connecticut authority in support
of his claim that the state constitutional due process
clause requires a more stringent analysis regarding the
admission of confessions. To the contrary, this court
has declined to require a higher burden for the admis-
sion of confessions under the state constitution than
the federal constitution. See, e.g., *State* v. *Lockhart*,
supra, 543–44 (declining to require recording of confes-
sions as constitutional requirement or under court's
supervisory authority). Third, the defendant fails to cite
to any federal precedent to support his claim. Fourth,
the only case from a sister state cited by the defendant
is *Commonwealth* v. *DiGiambattista*, 442 Mass. 423,
436–40, 813 N.E.2d 516 (2004). We find that case unper-
suasive because Massachusetts law requires the state
to prove the voluntariness of a confession beyond a
reasonable doubt; see, e.g., id., 439, 441, 448; and this
court has rejected such a requirement. See, e.g., *State*
v. *James*, supra, 237 Conn. 412–26 (declining to require
state to prove voluntariness of confession beyond rea-
sonable doubt). Fifth, the defendant does not point to
any evidence that the authors of our state constitution
intended to provide greater protection against involun-
tary confessions. See *State* v. *Lockhart*, supra, 556.

Furthermore, public policy also does not support
adopting the prophylactic rule requested by the defen-
dant. Trial courts are already required to "strongly con-
sider" the coercive nature of an interrogation in
determining whether, under the totality of the circum-
stances, a defendant's statements have been obtained

State *v.* Griffin

involuntarily. We trust that our trial courts are perfectly capable of taking into account any available social science in assessing whether particular interrogation tactics combined to overbear a defendant's will, to the extent they deem it appropriate.

Moreover, defendants are capable of vindicating such concerns by introducing, at the suppression hearing or at trial, social science evidence or expert testimony that they believe bears on the likelihood that an interrogation overbore a defendant's will. Defendants may also obtain appropriate jury instructions regarding the likelihood that particular interrogation tactics render a confession unreliable.[29] Accordingly, we decline to adopt a prophylactic rule at this time.

We reiterate that all of the circumstances of an interrogation must be taken into account in determining whether a confession is voluntary. Nevertheless, there are limits and boundaries that the police should not cross when conducting an interrogation. We find some of the tactics in the present case close to that line, and, in certain circumstances, those tactics could very well produce involuntary confessions. In light of these concerns, law enforcement would be ill-advised to read today's decision as condoning the use of all of the tactics employed in this case.

_____

[29] We note that the defendant called such an expert witness, and obtained such an instruction, at trial in the present case. Specifically, the jury was instructed that it must consider the voluntariness of the statement and that "[t]he test of voluntariness is whether an examination of all the circumstances present surrounding the rendering of the statement shows that the conduct of the police was such as to overbear the defendant's will to resist and resulted in a statement that was not truly self-determined. . . . Whether the statement was coerced means considering . . . whether it was forced or compelled out of the defendant by abusive conduct, by promises, implied or direct, or by deceit or artifice by the police [that] overbore the defendant's will to resist and critically impair[ed] his capacity for self-determination and, thus, brought about a statement that was not freely self-determined."

State *v.* Griffin

For the foregoing reasons, we conclude that the defendant's statements were voluntary and that the trial court properly admitted them into evidence at trial.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, D'AURIA and KAHN, Js., concurred.

McDONALD, J., concurring. I agree with and join the majority opinion, in which the majority concludes that the trial court correctly determined that the evidence seized from the residence of the defendant, Bobby Griffin, was not discovered as a result of an unlawful search and that the incriminating statements he made during his interrogation at the police station were not involuntary. Although I strongly disapprove of several of the tactics employed by the interrogating police officers and can easily envision a case in which those tactics could work collectively to overbear a suspect's will, my review of the video recording of the interrogation persuades me that this is not such a case, for the reasons identified in the majority opinion. I write separately to add my voice to the view set forth in part III of the concurring and dissenting opinion about the dangers of effectively sanctioning the practice by the police of lying to suspects in interrogations. I, too, would urge our state and local police to abandon this pernicious practice before legislative or judicial action is deemed necessary. In the meantime, I agree that the concerns raised by the concurring and dissenting justice warrant giving greater weight to such lying in assessing the voluntariness of a confession under the totality of the circumstances. Even affording the lies made to the defendant in the present case such weight, I remain convinced that his confession was voluntary.

State *v.* Griffin

ECKER, J., concurring in part and dissenting in part.[1]
The interrogating police detectives lied to the defendant, Bobby Griffin, about evidence of his guilt, threatened to arrest his family members, falsely indicated that the crime of which he was accused exposed him to the death penalty, and falsely indicated that he would face a lesser charge if he confessed to the theory of the crime proposed to him by the interrogating officers. The majority acknowledges that these types of interrogation tactics can be coercive in some circumstances, and expresses disapproval of some of them, but ultimately concludes that each of these deceptive tactics was noncoercive in the present case. I respectfully disagree. The flaw in the majority's analysis is twofold. First, it gives insufficient weight to the coercive effect of certain tactics used by the police to extract a confession from the defendant. Second, it fails to acknowledge or to appreciate that these tactics were not discrete and unrelated but, rather, integrally coordinated parts of a well established and widely used interrogation method specifically designed to employ psychological manipulation as a means to overwhelm a suspect's will. Seeing the interrogation for what it was—which is to say, assessing the cumulative effect of the numerous coercive tactics employed in the present case in their totality—it is clear that the state did not meet its burden of proving that the defendant's confession was voluntary.

I reach this conclusion by application of settled legal principles in parts I and II of this opinion. At the end of part II, I address the majority's response to this analysis. Part III, although not necessary to the conclusion I reach in this particular case, goes on to discuss in greater detail the particular interrogation tactic of lying about inculpatory evidence and explains why we should

[1] I agree with part I of the majority opinion, in which the majority concludes that the search of the home of the defendant, Bobby Griffin, that resulted in the seizure of the rifle and ammunition was not unconstitutional.

State *v.* Griffin

adopt a less tolerant attitude toward this tactic in the future.

I

The United States Supreme Court recognized in its watershed decision, *Miranda* v. *Arizona*, 384 U.S. 436, 445, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that "[a]n understanding of the nature and setting of this in-custody interrogation is essential to our decisions today." Although the issue presently before us is the voluntariness of a confession following a valid waiver of *Miranda* rights, it is similarly essential to understand how the specific tactics contested by the defendant fit into the well documented interrogation method typically used by law enforcement officers. I begin with a more complete picture of the method employed in the defendant's interrogation, which, as I later explain, reflects a particular application of broadly utilized interrogation techniques. Although there may not be universal consensus as to the propriety or wisdom of these techniques, there is no question that they are designed to work cumulatively to extract a confession from a suspect whom the interrogator believes is guilty.

A

The two police detectives interrogating the defendant initially allowed him to offer his own account of his whereabouts on the night in question, how the gun seized from his house came into his possession, and what he knew about the shooting. For the first couple of hours, the defendant disclaimed any participation in the crime. In response, the interrogators repeatedly asserted that they already had evidence that proved that the defendant was the shooter. The interrogators told the defendant, falsely, that two eyewitnesses had identified him from a photographic array as the shooter and as one of two men who were attempting to rob the victim, that fingerprints had been recovered from shell

State *v.* Griffin

casings found at the scene that the police were "gonna match to [the defendant's] prints," and that one of his coconspirators had given a statement that incriminated the defendant. They emphasized the fact that the (non-existent) eyewitnesses were strangers to the defendant and asserted that, as such, their identification could not be impeached at trial on the basis of a motive to lie or bias.

Because of their purported certitude that the evidence firmly established the defendant's identity as the shooter, the interrogators conveyed the idea to the defendant that the sole purpose of the interrogation was to help him by providing him with an opportunity to explain *why* he had shot the victim. They characterized the victim as just an "asshole drug dealer" and "a mope," who "brought this on himself" by not handing over the drugs and by making a comment about getting his gun. They repeatedly suggested that the shooting was an accident or an act of justifiable self-defense. They told the defendant that, if that was the case, it would make a "[h]uge difference in charges, huge difference in sentencing."

The interrogating officers also informed the defendant that, if he instead exercised his right to remain silent or continued to deny his involvement, things would get "worse" for him.[2] If he did not admit his role

_____

[2] The defendant was told, "if you don't [explain why it happened] and you sit there *and you keep* [*your*] *mouth shut*, it's just gonna get worse, it's gonna get worse and worse," and, "if you wanna spend the rest of your life in prison and sit there *and keep your mouth shut*, that's fine." (Emphasis added.) Although the majority is correct that courts often give significant weight to a valid waiver of *Miranda* rights in assessing the voluntariness of a confession, that waiver should be entitled to less weight when the interrogators effectively attempt to dissuade the defendant from exercising his right to revoke that waiver. See *United States* v. *Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994) ("there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor" (emphasis in original)); *United States* v. *Leon Guerrero*, 847 F.2d 1363, 1366 n.2 (9th Cir. 1988) ("threatening to inform the prosecutor of a suspect's refusal to

State *v.* Griffin

in the accidental or justifiable shooting, he could or would spend sixty-five years in jail or the state would "fry [him] . . . put [him] in the chair." They repeatedly made their point in terms that succinctly emphasized the futility of resistance: if the defendant did not confess, he was "fucked."

The threats made by the interrogators were multifaceted. The defendant was told that, because he had not admitted culpability, his mother and sister probably would be arrested for possession of the rifle recovered from the house. The officers hammered the point that the defendant was not facing a charge of "regular" murder, but felony murder because he and another person had robbed, or attempted to rob, the victim. The defendant was told—falsely, with no basis in fact or law— that "[t]he choice is yours," that it is "up to you" which crime he would be charged with because what he told them, and what the officers in turn reported to the judge, would determine whether he was charged with "felony murder or being in the wrong place at the wrong time murder," "[felony] murder, manslaughter."[3]

cooperate violates [the suspect's] fifth amendment right to remain silent"); *Beavers* v. *State*, 998 P.2d 1040, 1045–46 (Alaska 2000) ("A criminal suspect's right to remain silent in the face of police interrogation represents one of the most fundamental aspects of our constitutional jurisprudence. It includes the right to terminate an interrogation at any time. We regard any potential encroachment upon this right with the utmost concern. A law enforcement officer's threat of harsher than normal treatment—however phrased—essentially conveys to criminal suspects that they will be punished for their silence, including any refusal to give further answers. . . . Suspects are told, in effect, that they must give up their constitutional right to silence or they will suffer greater punishment. We view such threats with disfavor. Where they are used, the resulting confession should be considered involuntary unless the state can show affirmatively that the confession was voluntarily made." (Footnotes omitted.)). See generally 23 C.J.S. 222, Criminal Law § 1269 (2006) ("[a] waiver of [*Miranda*] rights may be revoked"). Plainly put, "*Miranda* warnings do not immunize statements obtained during custodial interrogations from being the product of coercion." *State* v. *Baker*, 147 Haw. 413, 434, 465 P.3d 860 (2020).

[3] The full quote of this statement, set forth in part I B of this opinion, makes clear that the interrogator was contrasting felony murder to manslaughter, not simple murder.

State *v.* Griffin

The defendant inquired how much prison time he would get for manslaughter but was not given an answer. Offered this "choice" in the face of the foregoing threats and fabricated evidence of guilt, the defendant ultimately adopted the narrative proposed by the officers and confessed to them that he accidentally had shot the victim during the course of an attempted robbery. The defendant, of course, was not charged with manslaughter; he was charged with felony murder, the very crime that his interrogators told him would be avoided by a confession. It was all a ruse.

B

The interrogation tactics employed against the defendant reflect a particular application of a method, commonly known as the Reid method, that has been the subject of scholarly debate and judicial criticism for decades.[4] See, e.g., *Miranda* v. *Arizona*, supra, 384 U.S. 448–53; *Dassey* v. *Dittmann*, 877 F.3d 297, 320–21 (7th Cir. 2017) (Wood, C. J., dissenting), cert. denied, U.S. , 138 S. Ct. 2677, 201 L. Ed 2d 1072 (2018); *Dassey* v. *Dittmann*, supra, 335–36 (Rovner, J., dissenting); A. Hirsch, Review, "Going to the Source: The 'New' Reid Method and False Confessions," 11 Ohio St. J. Crim. L. 803, 805–808 (2014); S. Kassin, "The Psychology of Confession Evidence," 52 Am. Psychologist 221, 222–24 (1997). The Reid Manual, the most widely used and influential interrogation training manual in the United States, sets forth tactics "for the interrogation of suspects whose guilt, in the *opinion* of the investigator,

---

[4] Part III of this opinion addresses how training methods are beginning to shift from adversarial, Reid type models to nonadversarial models in light of concerns about the effectiveness of the Reid method and its capacity to cause false confessions. Alan Hirsch, chair of the justice and law studies program at Williams College and author of articles examining the Reid method, testified for the defense at trial as an expert on this type of method and how it can affect the reliability of a confession.

State *v.* Griffin

seems definite or reasonably certain.''[5] (Emphasis in original.) F. Inbau et al., Criminal Interrogation and Confessions (4th Ed. 2004) p. 209 (Reid Manual); see also id., pp. 5–8 (distinguishing between ''nonaccusatory'' interview during which guilt or innocence is assessed and ''accusatory'' interrogation). The Reid Manual sets forth a nine step interrogation model.[6] See id., p. 215.

Professor Richard A. Leo, one of the foremost scholars on interrogation practices,[7] explains that ''each step

[5] ''An organization called John E. Reid & Associates [Inc.] developed the method in the mid-twentieth century and has since trained more interrogators than any other organization in the world. The Reid Technique is codified in Criminal Interrogation and Confessions (otherwise known as the 'Reid Manual'), a handbook that is frequently termed 'the bible of modern police interrogation training.' Over the past several decades, the Reid Manual's approach to interrogation has shaped 'nearly every aspect of modern police interrogations, from the setup of the interview room to the behavior of detectives.' '' (Footnotes omitted.) K. Wynbrandt, Comment, ''From False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing Convictions,'' 126 Yale L.J. 545, 549 (2016); see also *Dassey* v. *Dittmann*, supra, 877 F.3d 335–36 (Rovner, J., dissenting).

[6] The nine steps are: (1) ''The Direct, Positive Confrontation,'' (2) ''Theme Development,'' (3) ''Handling Denials,'' (4) ''Overcoming Objections,'' (5) ''Keeping the Suspect's Attention,'' (6) ''Handling the Suspect's Passive Mood,'' (7) ''Presenting the Alternative Question,'' (8) ''Bringing the Suspect into the Conversation,'' and (9) ''The Written Confession.'' F. Inbau et al., supra, p. 215.

[7] ''Leo is an [a]ssociate [p]rofessor of [l]aw at the University of San Francisco School of Law and formerly a professor of psychology and criminology at the University of California, Irvine. . . . He has written five books and more than fifty articles on police interrogation practices, false confessions, and wrongful convictions. . . . Leo holds both a J.D. and a Ph.D. in [j]urisprudence and [s]ocial [p]olicy (with a specialization in criminology and social psychology).'' (Citations omitted.) B. Gallini, ''Police 'Science' in the Interrogation Room: Seventy Years of Pseudo-Psychological Interrogation Methods To Obtain Inadmissible Confessions,'' 61 Hastings L.J. 529, 570 n.335 (2010). Leo, ''a highly respected expert in the area of police interrogation practice, the psychology of police interrogation and suspect [decision making], psychological coercion, false confessions, and wrongful convictions,'' has also ''consulted on more than 900 cases involving disputed interrogations, qualified as an expert witness 168 times in state, federal, and military courts, and has testified for both the prosecution and defense, as well as in civil cases.'' *Ex parte Soffar*, Docket Nos. WR-29980-03 and WR-29980-04, 2012 WL 4713562, *9 (Tex. Crim. App. October 3, 2012) (Cochran, J.,

State *v.* Griffin

of th[is] interrogation process builds on and reinforces
the previous one so as to systematically neutralize the
suspect's resistance, render him passive and compliant,
persuade him to agree to a minimizing scenario of how
he could have committed the crime, and then transform
his compliance into a full written statement. The [nine
step] method emphasizes that interrogation is a lengthy
and repetitive process in which the interrogator estab-
lishes psychological control over the suspect and gradu-
ally elicits a confession by raising the suspect's anxiety
levels while simultaneously lowering the perceived con-
sequences of confessing.'' R. Leo, Police Interrogation
and American Justice (2008) p. 113; accord G. Gudjons-
son, The Psychology of Interrogations, Confessions and
Testimony (1992) p. 62 (''[a]ccording to the [Reid]
model, a suspect confesses (i.e., tells the truth) when
the perceived consequences of a confession are more
desirable than the anxiety generated by the deception
(i.e., denial)''); see also *Dassey* v. *Dittmann*, supra, 877
F.3d 321 (Wood, C. J., dissenting).

Courts and commentators have categorized Reid's
nine steps as falling into two overarching techniques,
frequently referred to as maximization and minimiza-
tion.[8] See, e.g., *United States* v. *Monroe*, 264 F. Supp.
3d 376, 391 (D.R.I. 2017); *In re Elias V.*, 237 Cal. App.
4th 568, 583, 188 Cal. Rptr. 3d 202 (2015), review denied,
Docket No. S228370, 2015 Cal. LEXIS 9243 (Cal. Septem-
ber 23, 2015); *Commonwealth* v. *Cartright*, 478 Mass.
273, 289, 84 N.E.3d 851 (2017); S. Drizin & R. Leo, ''The

concurring), cert. denied sub nom. *Soffar* v. *Texas*, 569 U.S. 957, 133 S. Ct.
2021, 185 L. Ed. 2d 885 (2013).

[8] A prefatory step is to place suspects in an unfamiliar, unsupportive, and
stressful setting from which they will want to extricate themselves. See
*Miranda* v. *Arizona*, supra, 384 U.S. 449–50; S. Kassin, ''Inside Interrogation:
Why Innocent People Confess,'' 32 Am. J. Trial Advoc. 525, 532 (2009); M.
Kim, ''When and Why Suspects Fail To Recognize the Adversary Role of an
Interrogator in America: The Problem and Solution,'' 52 Gonz. L. Rev. 507,
510–11 (2016–2017).

State *v.* Griffin

Problem of False Confessions in the Post-DNA World,''
82 N.C. L. Rev. 891, 917 (2004); M. Gohara, ''A Lie for
a Lie: False Confessions and the Case for Reconsidering
the Legality of Deceptive Interrogation Techniques,'' 33
Fordham Urb. L.J. 791, 821–22 (2006); see also A. Hirsch,
supra, 11 Ohio St. J. Crim. L. 805 (categorizing steps
as confrontation and minimization); R. Leo, supra, pp.
150–55 (categorizing steps as use of positive and nega-
tive incentives). The maximization technique is designed
to convey ''the interrogator's [rock solid] belief that the
suspect is guilty and that all denials will fail. Such tactics
include making an accusation, overriding objections,
and citing evidence, real or manufactured, to shift the
suspects' mental state from confident to hopeless.''
(Internal quotation marks omitted.) *In re Elias V.*,
supra, 583; accord M. Kim, ''When and Why Suspects
Fail to Recognize the Adversary Role of an Interrogator
in America: The Problem and Solution,'' 52 Gonz. L. Rev.
507, 511 (2016–2017). ''[T]he interrogator aggressively
confronts the suspect with the magnitude of his situa-
tion, hoping to convince him that he is in serious trouble
and likely to be punished severely.'' M. Gohara, supra,
821–22. ''The minimization technique is the opposite. It
is designed to provide the suspect with moral justifica-
tion and face-saving excuses for having committed the
crime in question. This technique includes methods
such as lulling suspects into a false sense of security
by blaming the victim and downplaying the seriousness
of the crime.'' (Footnote omitted; internal quotation
marks omitted.) M. Kim, supra, 511–12; see also M.
Gohara, supra, 821. This tactic ''communicates by impli-
cation that leniency in punishment is forthcoming upon
confession.'' (Internal quotation marks omitted.) *In re
Elias V.*, supra, 583.

''[I]nterrogators will . . . commonly [say] that the
only way [that the suspect] can help himself is by provid-
ing the reasons he committed the crime. Usually, how-

State *v.* Griffin

ever, interrogators will first suggest possible reasons
or scenarios to get him to admit to it. . . . Interrogators
advance scenarios to persuade a suspect that if he
admits to the act he can—with the interrogators' help—
control how that act is framed to other audiences (e.g.,
prosecutors, judges, juries, his friends and family, the
victim, the victim's friends and family, the media, and
so on). In other words, he can explain his motive in a
way that will portray him in the most sympathetic light
and minimize his social, moral, and legal culpability.''
(Citation omitted.) R. Leo, supra, pp. 152–53.

"[T]he most significant and effective scenarios are
those that offer the suspect legal excuses or justifica-
tions for his alleged behavior. These types of scenarios
redefine the suspect's mens rea (i.e., mental state) and
thus the formal elements of the crime such that the
suspect's legal culpability is reduced or eliminated. For
example, it is common in murder investigations for
interrogators to suggest that the suspect killed the vic-
tim in self-defense. Because self-defense is not a crime,
the scenario suggests that the suspect will not be
charged or punished for admitting to it. It is also com-
mon in murder investigations for interrogators to sug-
gest that the suspect killed the victim accidentally, again
mitigating the criminality of the act and seemingly low-
ering the punishment if the suspect agrees to the acci-
dent scenario . . . . These scenarios are effective
because they 'pragmatically' communicate that the sus-
pect will receive a lower charge or lesser punishment
if he agrees to the suggested scenario . . . .'' (Citations
omitted.) Id., pp. 153–54.

A particular application of one of these minimization
or maximization tactics may be deemed so egregious
as to be sufficient in and of itself to establish coercion.[9]

_____

[9] See, e.g., *Quartararo* v. *Mantello*, 715 F. Supp. 449, 461 (E.D.N.Y.) ("Evi-
dence . . . procured [by way of a promise of leniency that was the equiva-
lent of a promise of immunity] can no more be regarded as the product of
a free act of the accused than that obtained by official physical or psychologi-

State *v.* Griffin

See *State* v. *Baker*, 147 Haw. 413, 435, 465 P.3d 860 (2020) ("a single coercive interrogation technique may render a confession involuntary"). Because these tactics, however, are designed to work cumulatively and synergistically to overcome a presumptively guilty suspect's resistance to admit his culpability; see R. Leo, supra, p. 113; their impact cannot be dismissed when individual tactics do not rise to this level. The totality of the circumstances test demands consideration of the cumulative impact of these tactics. See *Dassey* v. *Dittmann*, supra, 877 F.3d 322 (Wood, C. J., dissenting) ("The majority finds some significance in the notion that the detectives' tactics were not per se coercive, but that is a red herring. [The] cases cannot be assessed based on one sentence, or one restroom break, or the comfort (or lack thereof) of one room. The [United States] Supreme Court has instructed that the voluntariness inquiry requires a full consideration of the compounding influence of the police techniques as applied to this suspect." (Emphasis omitted; internal quotation marks omitted.)); *Wilson* v. *Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("a totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tac-

cal coercion. . . . This factor alone would make it difficult to conclude that the prosecution sustained its burden of proving by a preponderance of the evidence that the first confession was voluntary." (Citations omitted; internal quotation marks omitted.)), aff'd, 888 F.2d 126 (2d Cir. 1989); *United States* v. *Goldstein*, 611 F. Supp. 626, 632 (N.D. Ill. 1985) ("when the government misleads a suspect concerning the consequences of a confession, his statements are regarded as having been unconstitutionally induced by a prohibited direct or implied promise"); *People* v. *Weiss*, 102 Misc. 2d 830, 831–36, 424 N.Y.S.2d 844 (1980) (recognizing that totality of circumstances determines voluntariness but concluding that specific tactic of threatening defendant with loss of his business rendered statement involuntary). This does not mean that the totality of the circumstances is inapplicable in such a case. For example, there might be evidence that the tactic was not the motivating cause of the confession.

State *v.* Griffin

tics in an effort to overbear an accused's will''); *State*
v. *Baker*, supra, 423 ("[c]rucially, a court must not ana-
lyze the individual circumstances in isolation, but must
weigh those circumstances in their totality''); *State* v.
*Grey*, 274 Mont. 206, 211, 907 P.2d 951 (1995) ("[s]everal
factors can culminate in a totality of circumstances that
render a confession involuntary'').

The Hawaii Supreme Court's recent decision in *State*
v. *Baker*, supra, 147 Haw. 413, is a good example of the
proper approach.[10] That court identified seven separate,
potentially coercive interrogation tactics that had been
employed in that case, none of which was so individu-
ally coercive as to overcome the defendant's will.[11] See
id., 433–35. The court recognized, however, as have
other courts, that "[a]n interrogator's use of multiple

[10] The majority dismisses *Baker* as irrelevant because the Hawaii Supreme
Court decided the case under the Hawaii constitution. See footnote 23 of
the majority opinion. The case is not so easily swept aside. The Hawaii
court, applying a "totality of the circumstances" test, relied on settled *federal*
constitutional case law and principles, as well as case law from other jurisdic-
tions relying on the *federal* constitution, to reach its conclusion. See *State*
v. *Baker*, supra, 147 Haw. 424–34. I do not rely on *Baker* for any principles
grounded in state constitutional law but for the unremarkable proposition,
supported by a wealth of authority rooted in the federal law cited in part
II of this opinion, that the totality of the circumstances test requires the
consideration of the cumulative effect of the interrogation tactics. The major-
ity's rejection of this principle as stated in *Baker*, therefore, requires it to
distinguish that federal authority; it has not done so.

[11] The individual tactics identified in *Baker* were "(1) the comments sug-
gesting the public and media would perceive [the defendant] more favorably
if he confessed; (2) the implication that [the defendant] would be perceived
less favorably in court if he continued to deny guilt; (3) the minimization
narratives suggesting the conduct was understandable because of the drugs
and alcohol involved; (4) the use of unlawfully discriminatory [gender based]
stereotypes to excuse or explain conduct; (5) the use of the false friend
technique; (6) the insinuation that [the defendant's] refusal to admit to
assaulting the [complaining witness] would be set forth in the detective's
report and could adversely affect him; and (7) the detective's false assertion
that there was incontrovertible DNA evidence showing that [the defendant]
had sex with the [complaining witness], which, as the detective testified at
trial, was told to [the defendant] to '[try] to get the truth out of him.' '' *State*
v. *Baker*, supra, 147 Haw. 433.

State *v.* Griffin

coercive interrogation tactics in conjunction can exacerbate the coercive effect of the individual tactics. See [*Commonwealth* v.] *DiGiambattista*, [442 Mass. 423, 438–39, 813 N.E.2d 516 (2004)] (explaining that . . . coercive effect of . . . assertion about irrefutable evidence of guilt is worsened when it is combined with minimization tactics); [*State* v.] *Rettenberger*, 984 P.2d [1009, 1017 (Utah 1999)] ('The significance of the [false friend technique] comes in relation to other tactics and factors.').'' *State* v. *Baker*, supra, 433. It ultimately concluded: ''All of the tactics used [in *Baker*], except for the improper gender stereotyping, made an implied promise to [the defendant] that he would benefit if he confessed and suffer adverse consequences if he did not. The use of these tactics in conjunction with one another exacerbated their overall coercive effect on [the defendant] because they ultimately presented the same implicit promise of gaining a benefit by confessing—and receiving a detriment by not admitting guilt.'' Id.

II

I next turn to the voluntariness of the defendant's confession in the present case. It is important to emphasize that not every minimization and maximization tactic is coercive. See, e.g., *Commonwealth* v. *Harris*, 468 Mass. 429, 436–37, 11 N.E.3d 95 (2014) (particular minimization tactics used were not coercive). Several tactics employed in the present case are unchallenged and are widely accepted as within the proper bounds of interrogation. The tactics that are challenged include engaging in false evidence ploys, threatening the defendant's family with arrest, maximizing the consequences of not confessing, and suggesting that confessing would be met with leniency. The majority purports to apply the totality of the circumstances test, but its analysis suffers from two related flaws. When addressing each of the individual tactics, the majority unduly minimizes

State *v.* Griffin

its potential effect on the defendant. Then, having concluded that none of these tactics is coercive per se, it reaches the seemingly logical conclusion that they could not have overcome the defendant's will under the totality of the circumstances. I first explain why I take a different view of the coercive nature of the individual tactics and conclude that their cumulative effect rendered the defendant's confession involuntary. Following that explanation, I respond to the majority's critique of this opinion.

I begin with the false evidence of guilt presented to the defendant, principally consisting of the supposed existence of independent eyewitness identifications of the defendant as the shooter and fingerprints on shell casings found at the scene. I agree with the majority that courts generally have not deemed such conduct, *in and of itself*, sufficient to render a confession involuntary.[12] Many courts have, however, recognized that such ploys are a factor that should be considered when determining whether a confession was coerced. See, e.g., *Frazier* v. *Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) ("[t]he fact that the police misrepresented the statements that [the defendant's companion] had made is, *while relevant*, insufficient in our view to make this otherwise voluntary confession inadmissible" (emphasis added)); *Mara* v. *Rilling*, 921 F.3d 48, 80 (2d Cir. 2019) (misrepresentations regarding existence of eyewitness are "relevant to voluntariness"); *Holland* v. *McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("[t]he fact that the officer misrepresented to [the defendant] the strength of the evidence against him, while insufficient [by itself] to make [an] otherwise voluntary confession inadmissible, is one factor to consider among the totality of circumstances in determining voluntariness" (internal quotation marks omitted)),

_____

[12] In part III of this opinion, I address the broader policy concerns and ethical implications of sanctioning police lying in interrogations.

State *v.* Griffin

cert. denied, 506 U.S. 1082, 113 S. Ct. 1053, 122 L. Ed. 2d 360 (1993); *Green* v. *Scully*, 850 F.2d 894, 903 (2d Cir.) (noting that falsely informing defendant that his fingerprints matched prints in blood in victims' apartment "is the type of police tactic that makes the issue of voluntariness in this case such a close one" but concluding that defendant's statement revealed that he confessed for entirely different reason), cert. denied, 488 U.S. 945, 109 S. Ct. 374, 102 L. Ed. 2d 363 (1988); *State* v. *Swanigan*, 279 Kan. 18, 32, 106 P.3d 39 (2005) (lies that fingerprints were found at scene and matched to defendant "must be viewed as a circumstance in conjunction with others, e.g., additional police interrogation tactics"); *Commonwealth* v. *Libby*, 472 Mass. 37, 42, 32 N.E.3d 890 (2015) ("the use of false information by [the] police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily" (internal quotation marks omitted)); *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 433 ("our case law . . . suggests that where the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression, but that if the circumstances contain additional indicia suggesting involuntariness, suppression will be required" (emphasis in original)); *State* v. *Allies*, 186 Mont. 99, 113, 606 P.2d 1043 (1979) (lying to defendant about how much is known about his involvement in crimes was one of two variables weighing heavily in court's voluntariness analysis); *State* v. *Register*, 323 S.C. 471, 479, 476 S.E.2d 153 (1996) ("misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible"), cert. denied, 519 U.S. 1129, 117 S. Ct. 988, 136 L. Ed. 2d 870 (1997).

The majority discounts the relevance of the false evidence ploys in the present case because most of the statements regarding false evidence were made in the

State *v.* Griffin

first hour of the interrogation, when the defendant continued to deny his involvement and "pushed back" on these claims. Part II of the majority opinion. I find this temporal isolation to be a serious mistake because it ignores the fundamentally integrated nature of the interrogation tactics at issue and the cumulative and synergistic effect, over time, of the various tactics employed by the police. The entire point of the maximization and minimization techniques is that they work together over the course of the interrogation. See *State* v. *Baker*, supra, 147 Haw. 423, 433. It is significant, moreover, that the interrogators not only returned to the importance of the eyewitness identifications after the defendant's initial push back but also cast the false evidence as effectively unimpeachable—an assertion that could only be intended to convince the defendant that resistance would be futile. In addition, simply because the defendant asserted that his fingerprints were not on the shell casings does not mean that he was unconcerned by the lead interrogator's unequivocal statements that the (nonexistent) prints were "gonna" match the defendant's. These lies about the strength of the evidence against the defendant undoubtedly contributed to the pressure on him to "choose" to confess to manslaughter rather than to maintain his disavowal of responsibility and face felony murder charges.[13] The lies played an obvious and essential role in communicating the drumbeat theme of the Reid method, which is that resistance is futile and confession is the only rational choice.

With regard to the threat to arrest the defendant's mother and sister, the majority acknowledges that this threat "apparently was intended to exploit and play on the defendant's previously expressed concern" about his family's criminal exposure for the rifle. Part II A

_____

[13] In part III of this opinion, I give examples of cases in which a false confession was obtained after the police, along with the use of other coercive tactics, lied to the defendant about inculpatory evidence.

State *v.* Griffin

of the majority opinion. The majority also refuses to
"condone" this tactic and "acknowledge[s] that such
tactics can provide a basis for concluding that a confes-
sion is involuntary." Id. I agree with each of these state-
ments, although I would have expressed my disapproval
of this tactic in far stronger terms. I disagree, however,
with the majority's inexplicable decision to overlook
the coercive effect of this conduct simply because it
was the defendant who had initially raised this matter.
The logic of this point escapes me. If anything, the
defendant's admitted concern about his family's welfare
makes the tactic more coercive because it demonstrates
that he was susceptible to his interrogators' exploitation
of that fear, and the interrogators used this psychologi-
cal vulnerability improperly to increase the pressure
on the defendant to confess. Given that the defendant
had stated from the outset that he would take responsi-
bility for possession of the rifle, and there was no evi-
dence that anyone else in the home knew about the
rifle; see *State* v. *Rhodes*, 335 Conn. 226, 234, 249 A.3d
683 (2020); his family members were not actually at
risk of criminal exposure, and it was coercive for the
interrogators to suggest that the defendant's failure to
take responsibility for the shooting put them at such
risk. See *People* v. *Dowdell*, 227 Cal. App. 4th 1388, 1401,
174 Cal. Rptr. 3d 547 (2014) ("[a] threat by [the] police
to arrest or punish a close relative, or a promise to free
the relative in exchange for a confession, may render an
admission invalid" (internal quotation marks omitted)),
review denied, Docket No. S220560, 2014 Cal. LEXIS
9829 (Cal. October 15, 2014), and review denied sub
nom. *In re Lincoln*, Docket No. S220800, 2014 Cal.
LEXIS 9837 (Cal. October 15, 2014).

With regard to the interrogators' statements maximiz-
ing the consequences of not confessing, I agree in part
with the majority's treatment of this conduct. There
was nothing improper about telling the defendant that

State *v.* Griffin

he could or would face a sixty-five year term of imprisonment if he were convicted of felony murder, or even murder. This was an accurate statement of the law, consistent with the known facts of the crimes. See *State* v. *Evans*, 146 N.M. 319, 328, 210 P.3d 216 (2009) ("[T]hreats that merely highlight potential real consequences, or are adjurations to tell the truth, are not characterized as impermissibly coercive. . . . It is not per se coercive for [the] police to truthfully inform an accused about the potential consequences of his alleged actions." (Citation omitted; internal quotation marks omitted.)). I disagree with the majority, however, that the lead interrogator's reference to the death penalty should not be given meaningful weight in the totality of the circumstances analysis. The threat was emphatically not an accurate statement of the law, but a rank falsehood; the defendant could not have been exposed to a potential death sentence. See *People* v. *Holloway*, 33 Cal. 4th 96, 115–17, 91 P.3d 164, 14 Cal. Rptr. 3d 212 (2004) (contrasting cases in which officers properly and accurately represented that death penalty was available from cases in which officers improperly made false representations regarding death penalty), cert. denied, 543 U.S. 1156, 125 S. Ct. 1302, 161 L. Ed. 2d 122 (2005). Irrespective of the facts that it was "a single, isolated statement" and that the other interrogator immediately thereafter changed the subject; part II A of the majority opinion; it defies common sense to conclude that the possibility of a death sentence was shrugged off or forgotten by the defendant. Cf. *Green* v. *Scully*, supra, 850 F.2d 903 (deeming it significant that improper "scare tactic" of referring to electric chair was not further employed and that petitioner was told several times that "this case was 'not about the chair' ").

The interrogator's statement about the death penalty was not the only misrepresentation of law made to the defendant. The interrogators repeatedly indicated to

State *v.* Griffin

the defendant that, without a confession, he would face
a felony murder charge, but suggested that, if he admit-
ted that the shooting was accidental or in self-defense,
he would face far lesser charges, in particular, man-
slaughter. Again, none of this is true. Neither accident
nor self-defense is relevant when the elements of felony
murder are established. See, e.g., *State* v. *Montgomery*,
254 Conn. 694, 734, 759 A.2d 995 (2000); *State* v. *Amado*,
254 Conn. 184, 201–202, 756 A.2d 274 (2000); *State* v.
*Lewis*, 245 Conn. 779, 812, 717 A.2d 1140 (1998). The
"choice" that the interrogators offered to the defendant
between being charged with felony murder (if he
refused to admit culpability) or with manslaughter (if
he confessed) was completely fabricated and terribly
misleading.[14] "Unlike misrepresentations of fact, which
generally are not enough to render a suspect's ensuing
confession involuntary, [p]olice misrepresentations of
law . . . are much more likely to render a suspect's
confession involuntary." (Internal quotation marks
omitted.) *Johnson* v. *State*, 268 So. 3d 806, 810 (Fla.
App. 2019); see also *United States* v. *Lall*, 607 F.3d 1277,
1285 (11th Cir. 2010); *People* v. *Cahill*, 22 Cal. App.
4th 296, 315, 28 Cal. Rptr. 2d 1 (1994), review denied,
California Supreme Court, Docket No. S020126 (June
2, 1994); *State* v. *Valero*, 153 Idaho 910, 913, 285 P.3d
1014 (App. 2012); *Commonwealth* v. *Baye*, 462 Mass.
246, 257, 967 N.E.2d 1120 (2012). "Although we do not
require a law enforcement officer to inform a suspect
of the penalties for all the charges he may face, if he
misrepresents these penalties, then that deception

---

[14] The defendant ultimately was charged with both felony murder and
murder. Although treating the shooting as an "accident" would be relevant
to the murder charge because the absence of proof of intent to cause death
would support only a conviction of manslaughter; see General Statutes
§§ 53a-54a and 53a-55; the clear import of the interrogator's comments was
that the defendant could also avoid a *felony murder* charge if he admitted
that the shooting occurred by accident or in self-defense, as the interrogators
proposed. See also footnote 18 of this opinion (addressing false charging
choice proposed to defendant). This representation was blatantly false.

State *v.* Griffin

affects our evaluation of the voluntariness of any resulting statements.'' *United States* v. *Young*, 964 F.3d 938, 944 (10th Cir. 2020).

The majority recognizes that the interrogators made many statements suggesting that the defendant would receive leniency in exchange for confessing. It dismisses the coercive effect of these statements because the interrogators did not "definitively" promise leniency, and case law recognizes that it is not coercive to tell a defendant that cooperation would be to his benefit. Part II A of the majority opinion. The first reason, although supported by some authority, ignores reality by failing to acknowledge that an officer's implied promise of leniency may be just as meaningful to a lay defendant as a "definitive" promise of leniency. See S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 917 n.138 (citing psychology research addressing " '[p]ragmatic [i]mplication,' " which "refers to the sending and processing of implicit meanings in communication, as occurs when an individual 'reads between the lines' or when information or meaning is inferred from what a speaker is saying or suggesting"). Many courts have recognized that an implied promise of leniency can convey the same message as an express one.[15] See, e.g., *United States* v. *Craft*, 495 F.3d 259, 263–64 (6th Cir.), cert. denied, 552 U.S. 1052, 128 S. Ct. 679, 169 L. Ed. 2d 532 (2007); *People* v. *Cahill*, supra, 22 Cal. App. 4th 311–15; *Martin* v. *State*, 107 So. 3d 281, 314 (Fla. 2012), cert. denied, 570 U.S. 908, 133 S. Ct. 2832, 186 L. Ed. 2d 890 (2013); *State* v. *Baker*, supra, 147 Haw. 433; *State* v. *Smith*, 162 Idaho 878, 885, 406 P.3d 890 (App. 2017),

---

[15] John E. Reid & Associates, Inc., has responded to critics of its method in a posting on its website entitled "Clarifying Misinformation about The Reid Technique," which states: "The Reid [t]echnique teaches that the investigator should not offer any direct or *implied* promises of leniency to the subject." (Emphasis added.) John E. Reid & Associates, Inc., Clarifying Misinformation about the Reid Technique, p. 2, available at http://www.reid.com/pdfs/20120311.pdf (last visited July 19, 2021).

State *v.* Griffin

review denied, Idaho Supreme Court, Docket No. 44499-
2016 (December 21, 2017); *McGhee* v. *State*, 899 N.E.2d
35, 38 (Ind. App. 2008), transfer denied, 915 N.E.2d 995
(Ind. 2009); *State* v. *Nicklasson*, 967 S.W.2d 596, 606
(Mo.), cert. denied, 525 U.S. 1021, 119 S. Ct. 549, 142
L. Ed. 2d 457 (1998); *State* v. *Old-Horn*, 375 Mont. 310,
317, 328 P.3d 638 (2014); *State* v. *L.H.*, 239 N.J. 22, 43–46,
215 A.3d 516 (2019). As the Massachusetts Supreme
Judicial Court noted: "We have long recognized that
false promises . . . as might excite hopes in the mind
of the prisoner, that he should be materially benefitted
by making disclosures can undermine a defendant's
ability to make an autonomous decision to confess, and
are therefore properly regarded as coercive. . . . Such
promises may be either expressed or implied."[16] (Cita-
tion omitted; internal quotation marks omitted.) *Com-
monwealth* v. *Baye*, supra, 462 Mass. 257–58; see also
*Commonwealth* v. *DiGiambattista*, supra, 442 Mass.
435–36 ("[c]oercion may be readily applied by way of
implied threats and promises, just as it is by express
threats and promises"); cf. *State* v. *Phelps*, 215 Mont.
217, 224, 696 P.2d 447 (1985) (although confession must
not be "obtained by any direct or implied promises,
however, slight," alleged promise that is "couched in
terms of a mere possibility or an opinion . . . does not
constitute a sufficient promise to render a confession
involuntary" (internal quotation marks omitted)). The
question is not whether the officers spoke in definitive
or formally binding contractual terms, but whether a

---

[16] Massachusetts is one of a handful of jurisdictions that requires the
state to prove voluntariness beyond a reasonable doubt rather than by
the preponderance of the evidence standard applied by the United States
Supreme Court. However, that fact does not negate the relevance of Massa-
chusetts case law regarding what constitutes coercive conduct. See *Com-
monwealth* v. *Baye*, supra, 462 Mass. 255 n.11 ("[o]ur cases remain broadly
consistent with United States Supreme Court precedent on the voluntariness
of statements made to [s]tate actors, except that we require the [c]ommon-
wealth to meet a heightened burden of proof in demonstrating volun-
tariness").

State *v.* Griffin

reasonable person in the defendant's position would have interpreted their statements as a promise of leniency. See *Grades* v. *Boles*, 398 F.2d 409, 412 (4th Cir. 1968) ("[t]he perspective from which the statements must be viewed is that of the defendant"); *People* v. *Conte*, 421 Mich. 704, 739–40, 365 N.W.2d 648 (1984) ("[I]t is from [the] defendant's perspective that we will view the alleged promises. . . . The inquiry will be whether the defendant is likely to have reasonably understood the statements in question to be promises of leniency." (Citations omitted.)).

The second reason cited by the majority to condone the interrogators' false "suggestions" of leniency is that it is permissible to tell a suspect that it would benefit him to cooperate. Part II A of the majority opinion. This is a correct and uncontroversial statement of the law, but the point has no application to the contested statements in the present case. It is true enough that the interrogators properly could tell the defendant that, if he took responsibility—whether claiming accident, self-defense, or simply an intentional but regrettable act— he could likely help himself.[17] They properly could tell him that, by doing so, he *could* face lesser punishment. These would not be false statements. An early admission of responsibility could reduce the sentence ultimately imposed. It is an entirely different matter, however, to falsely convey to the defendant that it was

---

[17] See *Rogers* v. *State*, 289 Ga. 675, 678–79, 715 S.E.2d 68 (2011) (telling defendant " 'you are not trying to help yourself' " did not make confession involuntary because exhortation to tell truth and telling suspect that truthful cooperation may be considered by others is permissible); *State* v. *Flowers*, 204 So. 3d 271, 280 (La. App. 2016) ("a confession is not rendered inadmissible because officers 'exhort or adjure' an accused to tell the truth"), writ denied, 224 So. 3d 983 (La. 2017); *State* v. *Thomas*, 711 So. 2d 808, 811 (La. App. 1998) ("a mild exhortation to tell the truth, or an indication that if the defendant cooperates the officer will 'do what he can' or 'things will go easier,' will not negate the voluntary nature of a confession"), writ denied, 747 So. 2d 8 (La. 1999).

State *v.* Griffin

his "choice" and "up to him" as to whether he was charged with felony murder or a far less serious crime (i.e., a "huge difference in charges").[18] See *United States ex rel. Everett* v. *Murphy*, 329 F.2d 68, 70 (2d Cir.) ("[a] confession induced by [the] police falsely promising assistance on a charge far less serious than the police knew would actually be brought is not to be considered a voluntary confession"), cert. denied, 377 U.S. 967, 84 S. Ct. 1648, 12 L. Ed. 2d 737 (1964); *State* v. *McCoy*, 692 N.W.2d 6, 28 (Iowa 2005) (officer can tell suspect that it is better to tell truth, but, if officer tells suspect what advantage is to be gained or is likely from making confession, officer's statement becomes promise of leniency rendering statement involuntary). This was an implicit promise that the interrogators could not keep, not only because they lacked the authority to make good on any such promise but, more importantly, because the promise had no realistic basis in the law. As such, the promise of leniency in the present case is a highly relevant factor in assessing the voluntariness of the confession. See P. Marcus, "It's Not Just About *Miranda*: Determining the Voluntariness of Confessions in Criminal Prosecutions," 40 Val. U. L. Rev. 601, 621–22 and n.124, 622 n.129 (2006) (citing case law demonstrating that promise of leniency does not, by itself, require suppression of confession but is relevant factor in totality of circumstances analysis, except when promise

---

[18] The falsity of the representation is especially extreme in the present case because the homicide occurred during the course of a robbery (or attempted robbery), which, as the interrogators correctly informed the defendant, exposed him to a felony murder charge. Consequently, this was not simply a case in which the interrogators falsely indicated that the defendant's confession to an accidental shooting would result in a manslaughter charge, when the choice of charges actually would be a matter left entirely to the prosecutor's discretion (i.e., misrepresentation of fact). Rather, the interrogators affirmatively misled the defendant by telling him that the accident/self-defense narrative proposed to him was relevant and material to his criminal exposure for felony murder, which was untrue *as a matter of law*.

State *v.* Griffin

lacks causal connection to decision to confess or promise is kept).

The timing of this particular aspect of the interrogation also warrants consideration because the defendant agreed to give a confession immediately after being presented with this legally baseless "choice." Under the majority's view that temporal proximity to the confession is key in assessing the coercive effect of an interrogation tactic, this tactic should be deemed particularly significant given that the defendant's confession immediately followed his interrogator's implied promise that the defendant's confession could result in only a manslaughter charge. Although the synergistic and cumulative nature of the interrogation method at issue compels me to disagree with the majority's view regarding the importance of temporal proximity generally, this particular aspect of the interrogation plainly was the tipping point for the defendant, and the false information conveyed to the defendant in this respect should also be given significant weight in assessing whether his confession was coerced.

Finally, it is important to consider that the promises of leniency if the defendant confessed were juxtaposed against threats that the judge would be told that the defendant was not cooperating, which would be "worse" for the defendant. The Kansas Supreme Court had this to say about such a tactic: "This court has held that, without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary. . . . Kansas appellate courts, however, have not addressed the other side of the same coin . . . i.e., law enforcement conveying a suspect's *lack* of cooperation to the prosecutor. A growing number of courts have disapproved [of] this tactic. Those not finding that it is coercive per se regard it as another circumstance to be considered in determining the voluntariness of the con-

State *v.* Griffin

fession.'' (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Swanigan*, supra, 279 Kan. 33–34; see also *State* v. *Rettenberger*, supra, 984 P.2d 1018 (''[p]romises of leniency necessarily imply the threat of harsher punishment'').[19]

The interrogators' use of multiple, coercive interrogation tactics plainly exacerbated the coercive effect of each individual tactic. It took close to four hours for the collective effect of these tactics to overbear the defendant's will to resist the interrogators' pressure to confess to accidentally shooting the victim. The fact that the defendant failed to present evidence that he had any specific characteristics that rendered him particularly susceptible to coercion[20] does not negate

---

[19] The Reid Manual itself provides: ''The important question to answer is whether it is human nature to accept responsibility for something we did not do in the face of contrary evidence. . . . Would a suspect, innocent of a homicide, bury his head in his hands and confess because he was told that the murder weapon was found during a search of his home? Of course not! However, consider that such false statements were then used to convince the suspect that regardless of his stated innocence, he would be found guilty of the crime and would be sentenced to prison. Further, the investigator tells the suspect that if he cooperates by confessing, he will be afforded leniency. Under these conditions it becomes much more plausible that an innocent person may decide to confess—not because fictitious evidence was presented against him, but because the evidence was used to augment an improper interrogation technique (the threat of inevitable consequences).'' F. Inbau et al., supra, pp. 428–29.

[20] In his motion to suppress his statement, the defendant represented that his suppression hearing would show that he is of limited intelligence and highly susceptible to suggestion. For reasons that are not apparent from the record, the defendant did not present support for this assertion until his sentencing hearing, when he submitted a psychological evaluation indicating that he has an intelligence quotient (IQ) score between 80 and 85—low average—with mild, intellectual impairments, corresponding to a '' 'mental age' '' equivalency of fourteen years, and a tendency to cede to authority or social pressure. The trial court's only reference to the evaluation was in connection with the characterization of the crime as ''an impetuous decision.'' The court concluded that ''[the defendant's] conduct *during this crime and the aftermath of the crime*, in the court's view, clearly contradicts and undermines [the psychologist's] statements [in the evaluation] that the defendant . . . was likely to be nonassertive and [to] adapt socially to his surroundings. He certainly did not [cede] control to other people based on

State *v.* Griffin

the coercive effect of this multidimensional strategy.[21]

the court's view of the credible evidence that was presented." (Emphasis added.) The majority infers from the trial court's failure to specify what it meant by "aftermath of the crime" that it means every action taken by the defendant after the crime occurred, including his conduct in the interrogation, and thus the court made a wholesale rejection of the psychologist's opinion. See footnote 28 of the majority opinion. I believe that the context plainly indicates otherwise. I also note that the court made no mention of the psychologist's assessment of the defendant's IQ and mental age.

[21] The trial court and the majority, in assessing the voluntariness of the defendant's confession, ascribe significance to the fact that the defendant maintained a calm demeanor throughout the interrogation. This view conforms to case law that implicitly assumes that a person's external demeanor provides a reliable indication of his or her internal emotional state during an interrogation, and, thus, a calm demeanor suggests the absence of coercion. This unexamined assumption strikes me as dubious at best. We now know that a subject's external appearance may not accurately reflect his or her internal reality. See A. Vrij, Detecting Lies and Deceit: The Psychology of Lying and the Implications for Professional Practice (2000) p. 38 (summarizing scientific evidence showing that observable behavioral cues assumed to indicate deceit do not do so). We also know that cultural differences between the subject and the observer greatly increase the likelihood that the subject's external demeanor will be misconstrued. See J. Simon-Kerr, "Unmasking Demeanor," 88 Geo. Wash. L. Rev. Arguendo 158, 161 (2020) ("Demeanor is understood to be a guide to a [witness'] credibility in the sense that we can 'read' it for clues to a person's truthfulness. Probing behind this assumption reveals it to be both culturally mediated and without basis in science, rather than reflecting a truism about human beings. Other cultures have different expectations about the revelatory nature of demeanor that, in turn, reflect different beliefs about the relationship between the internal and the external.").

One important example of this phenomenon is documented in a substantial body of literature indicating that it is not uncommon for individuals growing up in a violent home or neighborhood, as the defendant in the present case did, to adopt a mask of unemotional fearlessness as a coping mechanism. See, e.g., N. Dowd, "Black Boys Matter: Developmental Equality," 45 Hofstra L. Rev. 47, 93 (2016) ("[b]ravado is particularly the response in high risk neighborhoods for self-protection"); S. Dworkin, "Masculinity, Health, and Human Rights: A Sociocultural Framework," 33 Hastings International & Comp. L. Rev. 461, 474 (2010) ("marginalized men may be [overly reliant] on garnering identity through narrow definitions of masculinity in order to garner status and respect"); M. Thomas, "The African American Male: Communication Gap Converts Justice into 'Just Us' System," 13 Harv. BlackLetter L.J. 1, 9 (1997) ("'[c]ool pose is a distinctive coping mechanism that serves to counter, at least in part, the dangers that black males encounter on a daily basis' "), quoting R. Majors & J. Billson, Cool Pose: The Dilemmas

State *v.* Griffin

"[P]olice induce most false confessions from mentally normal adults . . . ." R. Leo, supra, p. 234. The defendant's prior experience with the criminal justice system is a factor that cuts both ways. Although such experience may further bolster the defendant's understanding of his *Miranda* rights, a study has demonstrated that

of Black Manhood in America (1992) p. 5; see also R. Klein, Trial Practice Series: Trial Communication Skills (2d Ed. 2020) § 4:4 ("In truth, the feelings are always there, but for one reason or another, they are masked. With men, an open display of emotion is usually considered a sign of weakness. To be in control, to show no feelings, to act 'cool' in the face of any threat is considered manly."); M. Dargis & M. Koenigs, "Witnessing Domestic Violence During Childhood Is Associated with Psychopathic Traits in Adult Male Criminal Offenders," 41 Law & Hum. Behav. 173, 174 (2017) ("[E]xposure to community violence is directly correlated with callous-unemotional traits in detained juveniles. Moreover, this violence exposure mediates the relationship between callous-unemotional traits and delinquency, suggesting that witnessing violent acts account[s] for the relationship between callous-unemotional traits and heightened risk for engaging in violent behavior."); cf. *State* v. *Purcell*, 331 Conn. 318, 356–57, 203 A.3d 542 (2019) (acknowledging sociolinguistic research concluding that "indirect speech patterns are common within African-American spoken language" and are used as linguistic mechanism to avoid conflict (internal quotation marks omitted)).

I do not profess to know what psychological, emotional, and cultural factors actually lay behind this defendant's calm demeanor. My point is that I have no way to know or even guess, *and neither does the trial court or the majority*. That said, at least two aspects of the record make my alternative scenario plausible. First, one of the officers said to the defendant, well into the interrogation, "I think you're putting a tough guy front on," indicating that the interrogators themselves perceived the defendant to be wearing precisely the type of mask identified in the research studies. Second, the defendant's background places him within the demographic referenced in those studies. He had committed four felonies by the age of eighteen, and he reported "a significant family history of drug addiction and related criminal behavior in [his] first degree relatives" and described "violence in the home [and] exposure to violence as a youth in the streets (including shootings and stabbings) . . . ."

The fact that the latter information was not made known to the trial court until sentencing does not undermine my point, but reinforces it: no judge can even begin to understand the meaning of a defendant's calm demeanor during an interrogation without knowing much more about him or her. As a consequence, there is simply no basis to be confident that the defendant's "cool" demeanor signified internal calm rather than masked distress, and, in my view, it is a mistake to give weight to this consideration under these circumstances.

State *v.* Griffin

suspects with prior felony convictions are more vulnerable than others to false evidence ploys. See R. Leo, "Inside the Interrogation Room," 86 J. Crim. L. & Criminology 266, 295 (1996). "While [personal characteristics] are pertinent considerations when assessing whether, in the totality of the circumstances, the defendant's will was overborne . . . their significance is context dependent and diminishes with the severity of the police misconduct at issue . . . ." (Citation omitted.) *Commonwealth* v. *Baye*, supra, 462 Mass. 262; see also *United States* v. *Young*, supra, 964 F.3d 946 ("[the defendant's] personal characteristics are not dispositive, and they do not convince us that [the defendant] could withstand the coercion created by [the federal agent's] legal misrepresentations and promises of leniency"); *Green* v. *Scully*, supra, 850 F.2d 902 (officer's conduct is "[the] most critical circumstance").

Given the nature, variety, and pervasiveness of the coercive tactics employed in the present case, I would conclude that, under the totality of the circumstances, "the conduct of [the] law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 321, 96 A.3d 1199 (2014). "The use of these tactics in conjunction with one another exacerbated their overall coercive effect . . . ." *State* v. *Baker*, supra, 147 Haw. 433. The majority's conclusion to the contrary is not, in my view, a fair assessment of the *totality* of the circumstances.

Before I turn to the question of whether the improper admission of the defendant's confession requires a new trial, it is necessary to respond to several unfounded criticisms leveled by the majority. The majority contends that I have improperly discounted the trial court's finding that the defendant remained " 'calm and low-key' " by failing to give that finding due weight in

State *v.* Griffin

assessing whether the defendant's confession was voluntary, as the majority does; part II A of the majority opinion; and by instead acknowledging the possibility, supported by social science research, that psychological, emotional, and cultural factors may cause a person to adopt a mask of calm fearlessness. See footnote 21 of this opinion; cf. *State* v. *Purcell*, 331 Conn. 318, 356– 57, 203 A.3d 542 (2019) (drawing on sociolinguistic research not presented at trial to support analysis). I disagree with several of the underpinnings of this argument.[22] First, the issue is not *whether* the defendant appeared to be "calm and low-key" during his interrogation; indeed, contrary to the majority's suggestion, I fully accept this finding. The real question is *what to make of that demeanor.* In my view, the well-known phenomenon of masking and the social science research on that subject—not to mention the interrogating officer's own assessment that the defendant was putting on a "tough guy" facade while being questioned—cast doubt on the trial court's uncritical assumption that the defendant's outward demeanor reflected an inner state of unpressured calmness. Second, the fact that the defendant adopted a different demeanor at one point during the interrogation, pretending to be fearful of Quan Bezzle, supports rather than undermines the possibility that the defendant was engaged in masking. If we believe that the defendant was concealing his true emotions by pretending to be afraid of Bezzle, we must also take seriously the possibility that he was concealing his true emotions by pretending to be calm. The majority does not explain why it chooses to discern one instance of deceptive demeanor but dismiss out of hand the realistic possibility of a second instance of deceptive demeanor by the same person during the same interrogation. Third, the major-

---

[22] The majority also mischaracterizes my reasoning, but I rely on footnote 21 of this opinion to make my position clear.

State *v.* Griffin

ity draws on a well settled but inapt principle, namely, that a fact finder may rely on demeanor, *as one of many factors*, to assess a witness' *credibility*.[23] Because the trial court's determination of voluntariness is not a finding of fact to which we must defer, it is proper to take into account the research regarding masking and record evidence consistent with that research. See *State* v. *Christopher S.*, 338 Conn. 255, 274–75, 257 A.3d 912 (2021) ("[T]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . [A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . [W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . Accordingly, we conduct a plenary review of the record in order to make an independent determination of vol-

[23] Even in the context of using demeanor to assess credibility—an assessment made in an adversarial proceeding, not an interrogation—courts have begun to recognize that cultural differences and other factors may impact demeanor and, in turn, our ability to draw accurate inferences from appearances. See, e.g., *Djouma* v. *Gonzales*, 429 F.3d 685, 687–88 (7th Cir. 2005) ("[A]s a foreigner [the asylum applicant's] demeanor will be difficult for the immigration judge to 'read' as an aid to determining the applicant's credibility. . . . The [United States Department of Homeland Security and the United States Department of Justice] seem committed to [case-by-case] adjudication in circumstances in which a lack of background knowledge denies the adjudicators the cultural competence required to make reliable determinations of credibility."); see also *Yang* v. *Lynch*, 832 F.3d 817, 821 (7th Cir. 2016) ("we've commented on the unreliability of demeanor evidence generally . . . and the particular difficulty of using such evidence to evaluate the credibility of witnesses from other cultures" (citations omitted)), citing *United States* v. *Pickering*, 794 F.3d 802, 805 (7th Cir. 2015), and *Djouma* v. *Gonzales*, supra, 687; *Morales* v. *Artuz*, 281 F.3d 55, 61 and n.3 (2d Cir.) (acknowledging that idea that demeanor is useful basis for assessing credibility is "grounded perhaps more on tradition than on empirical data" and citing articles reviewing social science research), cert. denied sub nom. *Morales* v. *Greiner*, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

State *v.* Griffin

untariness.'' (Internal quotation marks omitted.)) The majority further criticizes this opinion for failing to focus on the defendant's personal characteristics such as his age, educational status, and intellectual functioning. The majority is correct that the defendant was over the age of majority and exhibited no obvious intellectual impairments. See footnote 20 of this opinion. The point of this opinion, however, is that the coercive tactics used by police interrogators are designed to overbear the will of a suspect even without impaired intellect or extreme youth. The statistics cited herein demonstrate this very point.

The majority also seriously misapprehends my point about the interrogators' misrepresentation about the defendant's "choice." The majority states that I interpret "the officers [to be] telling the defendant that he could decide which charges to levy against himself . . . .'' Footnote 24 of the majority opinion. I am saying nothing of the kind. My focus is on the following statement made immediately before the defendant's confession: "*The choice is yours. Murder, manslaughter. That's your choice.* That's what you're looking at. Right now, you're looking at murder, *felony murder*. Just cuz you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this story. We have too much against you.'' (Emphasis added.) In making this statement, the interrogators plainly were not suggesting that the defendant would be drafting the charging instrument or participating in the decision whether to charge himself with manslaughter or murder. The misrepresentation by the officers consisted of telling the defendant that, if he confessed to shooting the victim by accident—a narrative that the interrogators earlier had cast as wholly believable under the known circumstances—his "choice" to confess to that scenario would influence the charging decision and result in a reduction of the charge from felony murder

State *v.* Griffin

to manslaughter, i.e., it would make a "[h]uge difference
in [the] charges . . . ." See R. Leo, Police Interrogation
and American Justice, supra, pp. 153–54 (minimization
tactic used by police falsely suggests to "a suspect that
if he admits to the act he can—with the interrogators'
help—*control how that act is framed to other audiences
(e.g.*, *prosecutors*, *judges*, *juries* . . .)" and, in doing
so, can "*minimize his . . . legal culpability*," and sce-
narios suggesting accident or self-defense " 'pragmati-
cally' communicate that the suspect will receive a lower
charge or lesser punishment if he agrees to the sug-
gested scenario" (emphasis added)). The interrogating
officer made a gross misrepresentation of applicable
law because there was no basis whatsoever to tell the
defendant that confessing to the proposed narrative
would (or probably would, or even realistically might)
result in a manslaughter charge rather than "murder,
felony murder" charges.[24] See footnote 18 of this opin-
ion. Although the majority attempts to diminish the
effect of the legal misstatement by positing that the
prosecutor could "consider [accident or self-defense]
when choosing whether to charge the defendant with
felony murder," I consider that interpretation to be
objectively unreasonable because it simply cannot be
derived from what the officer actually said to the defen-
dant. Footnote 24 of the majority opinion. The officer's
words explicitly and unambiguously placed the
"choice" in the defendant's hands and mentioned noth-
ing whatsoever about prosecutorial discretion. The
majority's misreading of this point allows it to knock
down a strawman rather than address what this opinion
actually says.

---

[24] The majority interprets the interrogator's statement "[t]he choice is
yours" as a simple assertion "that it was [the defendant's] choice whether
to tell the truth." Footnote 24 of the majority opinion. The flaw in this
interpretation is that it ignores what the officer actually said. The "choice"
confronted by the defendant was expressly tied to the charges his "choice"
would determine: "The choice is yours. Murder, manslaughter. *That's* your
choice." (Emphasis added.)

State *v.* Griffin

Ultimately, the majority's view glosses over the paramount fact that the *state* bears the burden of proving that the defendant's confession was voluntary; see *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); which includes the burden of proving that the coercive interrogation tactics employed were not a motivating factor in the defendant's decision to confess. Cf. *Colorado* v. *Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (government bears burden of proof on threshold issue of whether valid waiver of *Miranda* rights occurred); *United States* v. *Matlock*, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 39 L.Ed.2d 242 (1974) (preponderance of evidence standard is controlling burden of proof for suppression hearings). I would conclude that the state has not proved that it is more likely than not that, in the absence of the cumulative effective of the coercive tactics employed— lying about inculpatory evidence, threatening to arrest the defendant's family members, falsely indicating that the defendant could face the death penalty, and making false promises of leniency—the defendant still would have confessed.

I would also conclude that the state failed to meet its burden of proving that the improper admission of the defendant's confession was harmless beyond a reasonable doubt. See, e.g., *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." (Internal quotation

State *v.* Griffin

marks omitted.) *Zappulla* v. *New York*, 391 F.3d 462,
473 (2d Cir. 2004), cert. denied, 546 U.S. 957, 126 S.
Ct. 472, 163 L. Ed. 2d 358 (2005), quoting *Arizona* v.
*Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L.
Ed. 2d 302 (1991); see also *Arizona* v. *Fulminante*,
supra, 313 (Kennedy, J., concurring in the judgment)
("the court conducting a [harmless error] inquiry must
appreciate the indelible impact a full confession may
have on the trier of fact"). "[A]n error in admitting the
confession should not ordinarily be deemed harmless
absent a strong showing by the state that [the defen-
dant's] guilt would have been assured based solely on
the other evidence presented at trial." (Emphasis omit-
ted; internal quotation marks omitted.) *Zappulla* v. *New
York*, supra, 473–74.

Only "when there is independent overwhelming evi-
dence of guilt" can the state meet its burden of proving
that the constitutional error was harmless beyond a
reasonable doubt. (Internal quotation marks omitted.)
*State* v. *Hafford*, supra, 252 Conn. 297. It cannot meet
that burden on this record. There were no eyewitnesses
or forensic evidence proving that the defendant was at
the scene. But cf. id., 298 (admission of confession was
harmless when defendant was seen fleeing crime scene
and, when approached by police, volunteered " 'I did
it' numerous times," defendant's blood and footprints
were found at crime scene, victim's blood was on defen-
dant's clothes and on knife discovered in his car, and
defendant's pubic hair was discovered near victim's
naked body). No fruits of the robbery were found in
the defendant's possession. The state's principal wit-
ness and the defendant's purported coconspirator,
Nathan Johnson, testified pursuant to a cooperation
agreement. The defendant's ambiguous comment about
the shooting to the confidential police informant and
the presence of the rifle in the defendant's home helped
bolster Johnson's testimony, but this evidence was not

State *v.* Griffin

direct proof of the defendant's actual participation in the crime itself. I would therefore reverse the defendant's conviction, except for the charge of criminal possession of a firearm, and remand for a new trial.

III

In part II of this opinion, I explained why, under the current legal standard and case law, the majority has incorrectly concluded that the defendant's confession was not involuntary under the federal constitution. In this section, I set forth justifications for reconsidering the treatment historically given to the use of the false evidence ploy in the interrogation process and provide support for an approach under which that ploy is given greater weight in assessing the coerciveness of an interrogation under the totality of the circumstances test than it is currently given.[25]

The view that a false evidence ploy during an interrogation rarely is coercive and has a minimally coercive effect, even when combined with other interrogation tactics, comes from a case that was decided more than one-half century ago. See *Frazier* v. *Cupp*, supra, 394 U.S. 737–39 (1969 case holding that confession was voluntary even though officer falsely told suspect that his admitted companion on night of crime had con-

_____

[25] My conclusion in part II of this opinion makes it unnecessary to decide whether the modest doctrinal reform that I propose in part III could be implemented as a matter of state constitutional law or in the exercise of this court's supervisory authority. I note that several of the considerations discussed in part III bear directly on some of the factors that are employed to determine whether our state constitution affords greater protection than the federal constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (setting forth six factors that, to extent applicable, are to be considered in construing contours of state constitution). "Although, in *Geisler*, we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157, 957 A.2d 407 (2008).

State *v.* Griffin

fessed to crime).[26] Courts and commentators have begun to recognize that this view is premised on an anachronistic understanding of coercion, formed before the prevalence of false confessions was known. See, e.g., *Dassey* v. *Dittmann*, supra, 877 F.3d 332 (Rovner, J., dissenting) ("[*Frazier* and its progeny] were born in an era when the human intuition that told us that 'innocent people do not confess to crimes' was still largely unchecked. . . . We know, however, that this statement is unequivocally incorrect. Innocent people do in fact confess, and they do so with shocking regularity. . . . In a world where we believed that 'innocent people do not confess to crimes they did not commit,' we were willing to tolerate a significant amount of deception by the police. . . . And so our case law developed in a factual framework in which we presumed that the trickery and deceit used by police officers would have little effect on the innocent." (Citation omitted; footnotes omitted.)); id., 336 (Rovner, J., dissenting) ("[w]hat has changed is not the law, but our understanding of the facts that illuminate what constitutes coercion under the law"); *State* v. *Baker*, supra, 147 Haw. 431 ("in light of the various studies and cases that have emerged . . . we recognize that false claims of physical evidence result in an unsettling number of false or involuntary confessions"); *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 434 ("[w]hile we adhere to the view that false statements about the evidence against the suspect do not automatically render the suspect's confession involuntary, we note that ongoing research has identified such use of false statements as a significant factor that pressures suspects into waiving their rights and making a confession"); M. Gohara, supra, 33 Fordham Urb. L.J. 794 ("The bedrock cases

_____

[26] In *Frazier*, the one lie told to the defendant was not made in concert with any other potentially coercive tactic, and the defendant confessed approximately one hour after the interrogation commenced. See *Frazier* v. *Cupp*, supra, 394 U.S. 737–38.

State *v.* Griffin

sanctioning police deception . . . [predate] the advent of DNA testing and the many exonerations that followed from DNA test results. . . . Examination of actual wrongful convictions and additional empirical data demonstrating the correlation between deceptive interrogation practices and false confessions provide a basis for reconsidering the line of cases that allow[s] [the] police to use trickery to obtain confessions. Such reconsideration is particularly critical because at the time those cases were decided, it was assumed that deceptive interrogations would not lead to false confessions.'' (Footnote omitted.)); see also *Corley* v. *United States*, 556 U.S. 303, 320–21, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) (''[c]ustodial police interrogation, by its very nature, isolates and pressures the individual . . . and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed'' (citation omitted; internal quotation marks omitted)); *State* v. *Purcell*, supra, 331 Conn. 361 (noting that, although United States Supreme Court recognized in *Miranda* possibility of coercive custodial interrogation resulting in false confessions, magnitude of this problem was not known until recently).

There is mounting proof that lying to suspects about evidence against them contributes to false confessions. ''False confessions are one of the leading causes of wrongful conviction of the innocent, second only to eyewitness misidentification.''[27] M. Godsey, ''Shining

[27] ''As of June 7, 2016, [t]he National Registry of Exonerations had collected data on [1810] exonerations in the United States since 1989 (that number as of December 4, 2017 is [2132]), and that data [include] 227 cases of innocent people who falsely confessed. This research indicates that false confessions (defined as cases in which indisputably innocent individuals confessed to crimes they did not commit) occur in approximately 25 [percent] of homicide cases.'' (Footnote omitted.) *Dassey* v. *Dittmann*, supra, 877 F.3d 332 (Rovner, J., dissenting). Interrogators themselves indicate that false confessions are surprisingly frequent. One self-report study of more than 600 professional interrogators found that the interrogators, based on their personal experiences and observations, estimated that, on average,

State *v.* Griffin

the Bright Light on Police Interrogation in America,'' 6
Ohio St. J. Crim. L. 711, 723 (2009); see also S. Kassin
et al., ''Police-Induced Confessions: Risk Factors and
Recommendations,'' 34 Law & Hum. Behav. 3, 3 (2010)
(''research suggests that false confessions and admis-
sions are present in 15–20 [percent] of all DNA exonera-
tions,'' which does not include false confessions
disproved before trial, many that result in guilty pleas,
those in which DNA evidence is not available, etc.).
There is near universal consensus that the known false
confessions represent a tip of the iceberg. See S.
Drizin & R. Leo, supra, 82 N.C. L. Rev. 921; M. Godsey,
supra, 724–25; A. Hirsch, supra, 11 Ohio St. J. Crim. L.
813; S. Kassin et al., supra, 3.

''From a convergence of three sources, there is strong
support for the proposition that outright lies can put
innocents at risk to confess by leading them to feel
trapped by the inevitability of evidence against them.
These three sources are: (1) the aggregation of actual
false confession cases, many of which involved use of
the false evidence ploy;[28] (2) one hundred-plus years

almost 5 percent of innocent suspects confess. See S. Kassin et al., ''Police
Interviewing and Interrogation: A Self-Report Survey of Police Practices
and Beliefs,'' 31 Law & Hum. Behav. 381, 392–93 (2007).

[28] Some examples cited in the literature include: Anthony Gray confessed
to rape and murder after a series of interrogations, during which detectives
falsely informed him that two other men had confessed to involvement in
the crime and had named Gray as the killer and that he had failed two
polygraph tests. Gray spent more than seven years in prison ''before he was
exonerated on the basis of DNA evidence.'' K. Wynbrandt, Comment, ''From
False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing
Convictions,'' 126 Yale L.J. 545, 545–46 (2016).

Marty Tankleff, then seventeen years old, confessed to killing his mother
and beating his father after an interrogator lied about the evidence of his
guilt, including that his father had said that he did it. His conviction was
later vacated, and the charges were dropped. See S. Kassin, ''Inside Interroga-
tion: Why Innocent People Confess,'' 32 Am. J. Trial Advoc. 525, 536 (2009).

John Watkins confessed to rape after the police falsely told him that they
had recovered his fingerprints from the crime scene, that the victim had
identified him, and that he had failed a voice stress analysis test. He was later
exonerated by DNA evidence. See S. Gross et al., National Registry of Exonera-

732 NOVEMBER, 2021 339 Conn. 631

State *v.* Griffin

of basic psychology research, which proves without
equivocation that misinformation can substantially alter
people's visual perceptions, beliefs, motivations, emo-
tions, attitudes, memories, self-assessments, and even
certain physiological outcomes, as seen in studies of
the placebo effect; and (3) numerous experiments, from
different laboratories, demonstrating that presentations
of false evidence increase the rate at which innocent
research participants agree to confess to prohibited acts

tions, Government Misconduct and Convicting the Innocent: The Role of
Prosecutors, Police and Other Law Enforcement (September 1, 2020) p. 56,
available at https://www.law.umich.edu/special/exoneration/Documents/
Government_Misconduct_and_Convicting_the_Innocent.pdf (last visited July
19, 2021).

Frank Sterling confessed to murder after officers falsely told him that his
brother had implicated him and that he was justified in hurting the victim
because she deserved it. Sterling was exonerated by DNA evidence that
implicated another man. See id., p. 45.

Robert Miller, later exonerated, confessed after being falsely told by a
detective that an eyewitness had seen him leaving the crime scene and
that this witness had identified him in a photograph. See B. Garrett, "The
Substance of False Confessions," 62 Stan. L. Rev. 1051, 1098 (2010).

In a recent opinion piece in the New York Times by three of the defendants
convicted as part of the group known as the "Central Park Five," the authors
explain how the interrogators' blatant lies—telling the defendants that the
police had matched their fingerprints to crime scene evidence and telling
each of them that the others had confessed and implicated each of them
in the attack—contributed to their false confessions. See Y. Salaam et al.,
"Act Against Coerced Confessions," N.Y. Times, January 5, 2021, p. A19.

In a book by a former Washington, D.C., homicide detective, he examined
how he could have elicited a confession from a suspect who he later proved
could not have committed the crime. See T. Jackman, "Homicide Detective's
Book Describes 'How the Police Generate False Confessions,' " Wash. Post,
October 20, 2016, available at https://www.washingtonpost.com/news/true-
crime/wp/2016/10/20/homicide-detectives-book-describes-how-the-police-
generate-false-confessions/ (last visited July 19, 2021). "He realized that
implying that [the suspect's] cooperation would get her better treatment
from the prosecutors, and minimizing her role in the case to obtain her
testimony against [her codefendants], as well as a mistaken handwriting
analysis and a bogus 'voice stress test,' got her to confess." Id.; see also M.
Gohara, supra, 33 Fordham Urb. L.J. 831 n.239 (providing examples of four
other cases in which defendants falsely confessed after police lied about
evidence inculpating them).

State *v.* Griffin

they did not commit.''[29] (Footnote added.) S. Kassin et
al., supra, 34 Law & Hum. Behav. 28–29. See generally M.
Gohara, supra, 33 Fordham Urb. L.J. 827–31 (providing
overview of ''[e]mpirical [s]tudies [e]stablishing [t]hat
[c]onfronting [s]uspects [w]ith [f]alse [e]vidence [a]nd
[o]ther [d]eceptive [i]nterrogation [p]ractices [i]nduces
[s]uspects to [c]onfess [f]alsely''); A. Hirsch, supra, 11
Ohio St. J. Crim. L. 805–806 and n.18 (address-
ing alt key experiment). The Reid Manual itself con-
cedes that, although lying to a suspect about inculpatory
evidence in and of itself would not cause a false confes-
sion, ''it becomes much more plausible that an innocent
person may decide to confess'' if ''such false statements
were . . . used to convince the suspect that regardless
of his stated innocence, he would be found guilty of
the crime and . . . sentenced to prison'' but would be
afforded leniency ''if he cooperates by confessing
. . . .'' F. Inbau et al., supra, p. 428.

''Psychologists have teased out two causal mecha-
nisms by which the false evidence ploy may give rise
to false confessions. . . . First, suspects may falsely
confess as an act of compliance when they perceive
that there is strong evidence against them.[30] Second,

---

[29] The doubters argue that the empirical evidence does not demonstrate
the frequency of the problem and may not accurately reflect proven cases
of innocence; see, e.g., F. Inbau et al., supra, pp. 442–43; L. Magid, ''Deceptive
Police Interrogation Practices: How Far Is Too Far?,'' 99 Mich. L. Rev. 1168,
1192 (2001); suggest that false confessions are such a rarity that their risk
may not outweigh the benefits of the questioned interrogation practices;
see, e.g., *Dassey* v. *Dittmann*, supra, 877 F.3d 318 n.8; or point to the
uncontested fact that social science experiments cannot replicate the high
stakes context of an interrogation for a serious crime. See, e.g., F. Inbau et
al., supra, p. 443; A. Hirsch, supra, 11 Ohio St. J. Crim. L. 805–808; S. Tekin
et al., ''Interviewing Strategically To Elicit Admissions from Guilty Suspects,''
39 Law & Hum. Behav. 244, 251 (2015). These concerns have been addressed
to my satisfaction in several sources, including *Dassey* v. *Dittmann*, supra,
331–33 (Rovner, J., dissenting), and A. Hirsch, supra, 806 n.18, 812–13,
825 n.129.

[30] Research also suggests that some innocent individuals may falsely con-
fess voluntarily during police interrogations ''because they believe that 'truth
and justice will prevail' later even if they falsely admit their guilt.'' B. Garrett,

State *v.* Griffin

innocent suspects confronted with evidence that law enforcement claims to prove their guilt as an incontrovertible fact may falsely confess because they have come to internalize the belief that [they] committed the crime without awareness.

"The key factor underlying each of these psychological processes is the defendant's perception that his or her likelihood of conviction at trial is high . . . . The false evidence ploy enables interrogators to artificially inflate an innocent suspect's estimated likelihood of conviction and thereby make a plea bargain appear rational."[31] (Footnote altered; footnotes omitted; internal quotation marks omitted.) K. Wynbrandt, Comment, "From False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing Convictions," 126 Yale L.J. 545, 552–53 (2016).

This tactic may be especially effective with those segments of society that are more likely to believe that they, or others in their community, have been treated unfairly by the police and the legal system. See K. Momolu, Gallup, Black Adults More Likely To Know People Mistreated by Police, (August 3, 2020), available at https://news.gallup.com/poll/316526/black-adults-likely-

"The Substance of False Confessions," 62 Stan. L. Rev. 1051, 1100 (2010); see, e.g., id., 1054–56 (Jeffrey Deskovic, exonerated of rape and murder with DNA evidence after making inculpatory statements, later explained that " '[b]elieving in the criminal justice system and being fearful for myself, I told [the police] what they wanted to hear' "). As I explain later in this opinion, this optimistic view of the criminal justice system is not universally shared.

[31] Several of the exonerated "Central Park Five" defendants recently explained: "It's hard to imagine why anyone would confess to a crime they didn't commit. But when you're in that interrogation room, everything changes. During the hours of relentless questioning that we each endured, detectives lied to us repeatedly. . . . It felt like the truth didn't matter. Instead, it seemed as though they locked onto one theory and were hellbent on securing incriminating statements to corroborate it. A conviction rather than justice felt like the goal." Y. Salaam et al., "Act Against Coerced Confessions," N.Y. Times, January 5, 2021, p. A19.

State *v.* Griffin

know-people-mistreated-police.aspx (last visited July 19, 2021) (reporting results of 2020 survey reflecting that 71 percent of ''[b]lack Americans . . . [report] know[ing] 'some' or 'a lot of' people who were treated unfairly by the police . . . twice the [response] rate among [w]hite Americans,'' and that 50 percent of black adults, and 61 percent of black Americans between ages eighteen and forty-four ''report knowing 'some' or 'a lot of' people who were unfairly sent to jail''); I. Capers, ''Crime, Legitimacy, and Testilying,'' 83 Ind. L.J. 835, 836 (2008) (''[f]or many people of color and members of other politically vulnerable groups, [it] . . . comes as [no] surprise'' that police officers misrepresent facts to justify traffic stops); D. Young, ''Unnecessary Evil: Police Lying in Interrogations,'' 28 Conn. L. Rev. 425, 468 (1996) (''Those people who protest their innocence in the face of police lies about overwhelming evidence . . . may genuinely fear that they are being framed with fabricated evidence. While a more sophisticated, educated, and financially secure individual may be confident that he or his lawyer ultimately will be heard and the accusations withdrawn, those not so well situated may fear punishment for wrongs they did not commit. In particular, members of social groups with disproportionately high conviction rates, such as young black men, may despair of release and conclude they must confess to something to escape a worse fate.'').

Recognition of the causal connection between deceptive interrogation tactics and false confessions has been a significant factor in a recent shift away from the use of the Reid method, which sanctions lying. One of the nation's largest police consulting firms has repudiated the Reid method; see Wicklander-Zulawski & Associates, Inc., Identify the Truth, available at https://www.w-z.com/truth/ (last visited July 19, 2021) (''[t]he high risk of false confessions, potential for incorrect or unreliable information, and ultimately the misapplication of con-

State *v.* Griffin

frontational techniques are all reasons why [Wicklander -Zulawski & Associates, Inc.] has chosen to no longer offer the confrontational approach in its course selections''); as have some foreign countries. See W. Kozinski, ''The Reid Interrogation Technique and False Confessions: A Time for Change,'' 16 Seattle J. Soc. Just. 301, 304 n.16, 333–34 (2017) (noting England's shift from Reid method after concluding that its overly manipulative and coercive tactics caused false confessions and subsequent adoption of England's alternative, nonconfrontational method by United Kingdom, Norway and New Zealand).

The connection between police deception in interrogation and false confessions has also prompted recent legislative action. A bill proposed in New York State, which notes this connection in its statement of purpose, would deem a confession or admission ''involuntarily made'' when it is obtained from a defendant ''by knowingly communicating false facts about evidence to the defendant . . . .''[32] Senate Bill No. S324, § 1, 2021–2022 Leg., Reg. Sess. (N.Y. 2021).

This evidence has led to a call to recognize the coercive effect of lies and deception and give these considerations due weight when assessing whether a confession was voluntary under the totality of the circumstances. See *Dassey* v. *Dittmann*, supra, 877 F.3d 331 (Rovner, J., dissenting) (''[R]eform of our understanding of coer-

[32] A bill also was raised in Connecticut in 2014, which would have established a presumption that a statement made by a suspect as a result of a custodial interrogation is inadmissible if the police knowingly present the suspect with false evidence or knowingly misrepresent the evidence about the case. See Raised Bill No. 5589, 2014 Sess., § 1. Interestingly, in written testimony submitted to the Judiciary Committee, the Division of Criminal Justice successfully urged no action on the bill, suggesting that the courts should address this concern on a case-by-case basis under the current state of the law rather than adopt a per se rule. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2014 Sess., pp. 3564–65. That is precisely what this opinion advocates.

State *v.* Griffin

cion is long overdue. When conducting a totality of
the circumstances review, most courts' evaluations of
coercion still are based largely on outdated ideas about
human psychology and rational [decision making]. It is
time to bring our understanding of coercion into the
twenty-first century.'');[33] *State* v. *Allies*, supra, 186 Mont.
113 (''[L]ying to [the] defendant about how much is
known about his involvement in the crimes . . . is par-
ticularly repulsive to and totally incompatible with the
concepts of due process embedded in the federal and
[Montana] constitutions. The effect is particularly coer-
cive . . . .'').

False confessions are not the only reason for concern.
From another vantage point, it should be immaterial
whether there is a basis to believe that the defendant's
confession in a given case was false. To the extent
that the foregoing evidence demonstrates the realistic
potential for coercion associated with lying as an inter-
rogation tactic, the United States Supreme Court has
reminded us that the rules that we adopt to prevent the
admission of involuntary confessions apply even when
it is clear that the defendant confessed to the truth:
''[C]onvictions following the admission into evidence
of confessions which are involuntary, i.e., the product
of coercion, either physical or psychological, cannot
stand. This is so not because such confessions are

---

[33] Judge Rovner's dissent in *Dassey* is particularly notable because it was
joined by two other Seventh Circuit judges. The four judges in the majority
did not decide the issue raised in Judge Rovner's dissent because they
concluded that that dissent's approach would not apply under the deferential
standard that the federal court was required to apply to the review of a
state court decision. See *Dassey* v. *Dittmann*, supra, 877 F.3d 302 (''[e]ven
if we were to consider the approach in past [United States] Supreme Court
decisions outmoded, as the dissents suggest, a state court's decision consis-
tent with the Supreme Court's approach could not be unreasonable under
[the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)]'').
Chief Judge Wood wrote a separate dissent, arguing that the confession
was involuntary despite the deferential standard of the AEDPA. See id.,
319–31 (Wood, C. J., dissenting).

State *v.* Griffin

unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the [s]tate must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. . . . To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration. Indeed, in many of the cases in which the command of the [d]ue [p]rocess [c]lause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissible methods in their inducement. Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the [f]ourteenth [a]mendment guarantees.'' (Citations omitted.) *Rogers* v. *Richmond*, 365 U.S. 534, 540–41, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); see also *Spano* v. *New York*, 360 U.S. 315, 320–21, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) (''The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.'').

These broader concerns about the integrity of the means by which we obtain confessions recognize that

State *v.* Griffin

the tactics employed by law enforcement have ramifica-
tions beyond the present case. Many courts have
expressed disapproval of the use of deception as an
interrogation tactic; see, e.g., *Ex parte Hill*, 557 So. 2d
838, 842 (Ala. 1989); *State* v. *Cayward*, 552 So. 2d 971,
973 (Fla. App. 1989), review dismissed, 562 So. 2d 347
(Fla. 1990); *State* v. *Old-Horn*, supra, 375 Mont. 318;
*People* v. *Robinson*, 31 App. Div. 2d 724, 725, 297
N.Y.S.2d 82 (1968); *State* v. *Jackson*, 308 N.C. 549, 573,
304 S.E.2d 134 (1983); *State* v. *Galli*, 967 P.2d 930, 936
(Utah 1998); sometimes quite vehemently. See, e.g.,
*United States* v. *Orso*, 266 F.3d 1030, 1039 (9th Cir.
2001) ("reprehensible"), cert. denied, 537 U.S. 828, 123
S. Ct. 125, 154 L. Ed. 2d 42 (2002); *Ex parte Hill*, supra,
842 ("especially repugnant when used against suspects
of diminished intellectual ability"); *State* v. *Phelps*,
supra, 215 Mont. 225 ("[w]e cannot overemphasize our
strong condemnation" (internal quotation marks omit-
ted)); *State* v. *Register*, supra, 323 S.C. 480 ("a deplor-
able practice"); *State* v. *Von Dohlen*, 322 S.C. 234, 243,
471 S.E.2d 689 ("reprehensible") (overruled on other
grounds by *State* v. *Burdette*, 427 S.C. 490, 832 S.E.2d
575 (2019)), cert. denied, 519 U.S. 972, 117 S. Ct. 402,
136 L. Ed. 2d 316 (1996). See generally *State* v. *Jackson*,
308 N.C. 549, 573, 304 S.E.2d 134 (1983) (noting general
view that this tactic is "not morally justifiable or a
commendable practice" (internal quotation marks
omitted)).

These tactics are condemned not only because of
their effect on the suspect but because they diminish
society's perception of the honesty and legitimacy of
the police. See *State* v. *Cayward*, supra, 552 So. 2d 975
("We must . . . decline to undermine the rapport the
police have developed with the public by approving
participation of law enforcement officers in practices
which most citizens would consider highly inappropri-
ate. We think that for us to sanction the manufacturing

State *v.* Griffin

of false documents by the police would greatly lessen the respect the public has for the criminal justice system and for those sworn to uphold and enforce the law.''); D. Young, supra, 28 Conn. L. Rev. 471 (''We entrust [the] police with the initial enforcement of our community standards, in the form of our criminal laws. When [the] police themselves misstate and violate the standards, even when that violation does not rise to a criminal level, they undermine their own role within the community.''); D. Young, supra, 468–69 (''Police lying also generates a systemic loss of integrity. Research and analysis by ethicists and philosophers [remind] us of the impact of lying on society and societal perceptions of such lying. . . . Truth from doctors, truth from business people, and truth from government officials are essential for us to plan our lives and to maintain control over our choices. We condemn lying in personal affairs and criminalize it in many contexts. . . . We condemn lying in part because we recognize that lying manipulates. If we want people to make free choices, we do not want them manipulated through lying.'' (Footnotes omitted.)).

Sanctioning lying in interrogations adds fuel to the current crisis in trust and confidence in the police, as reflected in nationwide protests. See S. Klein, ''Transparency and Truth During Custodial Interrogations and Beyond,'' 97 B.U. L. Rev. 993, 998–99 (2017) (''[W]e have reached a point where there is little trust in law enforcement and the criminal justice system writ large. Rioting in Ferguson, Missouri and Charlotte, North Carolina is a serious symptom of this distrust. In fact, only about [one] half of Americans report confidence in the police.'' (Footnotes omitted.)); K. Momolu, supra (71 percent of black Americans surveyed in 2020 reported ''know[ing] 'some' or 'a lot of' people who were treated unfairly by the police'').

339 Conn. 631 NOVEMBER, 2021 741

State *v.* Griffin

Legitimizing this unethical conduct also could encourage the police to adopt the pernicious attitude that the end justifies the means, which, in turn, could be used to justify other dishonest acts when the police are equally convinced of a suspect's guilt, such as lying in affidavits to support search or arrest warrants, planting evidence, and offering false testimony.[34] See *State* v. *Cayward*, supra, 552 So. 2d 975 ("[W]ere we to approve the conduct [by the police fabricating false evidence], we might be opening the door for [the] police to fabricate court documents, including warrants, orders, and judgments. We think that such a step would drastically erode and perhaps eliminate the public's recognition of the authority of court orders, and without the citizenry's respect, our judicial system cannot long survive.");[35] *Darity* v. *State*, 220 P.3d 731, 738 n.1 (Okla.

[34] The possibility that an end justifies the means mentality could result in some police officers committing perjury to advance what they perceive to be the greater public good is not hyperbole. Such conduct was sufficiently pervasive in New York City that police officers had their own name for the practice, "testilying"; see J. Goldstein, " 'Testilying' by Police: A Stubborn Problem," N.Y. Times, March 18, 2018, available at https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html (last visited July 19, 2021); and there is evidence that this conduct is not limited to that locale. "Judge Alex Kozinski of the Ninth Circuit has observed that it is 'an open secret long shared by prosecutors, defense lawyers and judges that perjury is widespread among law enforcement officers.' " I. Capers, supra, 83 Ind. L.J. 836–37. "Blue lies are so pervasive that even former prosecutors have described them as 'commonplace' and 'prevalent.' Surveyed prosecutors, defense attorneys, and judges believed perjury was present in approximately [20] percent of all cases. A separate survey of police officers was even more sobering. Seventy-six percent of responding officers agreed that officers shade the facts to establish probable cause; [48] percent believed judges were often correct in disbelieving police testimony." (Footnotes omitted.) Id., 870; see also K. Holloway, "Lying Is a Fundamental Part of American Police Culture," Salon, March 31, 2018, available at https://www.salon.com/2018/03/31/lying-is-a-fundamental-part-of-american-police-culture_partner/ (last visited July 19, 2021); Editorial, "Police Perjury: It's Called 'Testilying,' " Chicago Tribune, July 5, 2015, available at https://www.chicagotribune.com/news/opinion/editorials/ct-police-false-testimony-edit-20150702-story.html (last visited July 19, 2021).

[35] The Florida Appellate Court in *Cayward* made this statement when distinguishing between manufactured evidence and verbal lies, deeming the

State *v.* Griffin

Crim. App. 2009) (Chapel, J., dissenting) ("Courts have opened a Pandora's box by sanctioning police lies. The 'ends justify the means' rationale employed by most courts is very difficult to limit, and thus, the circumstances of 'permissible deceit' have increased. So too has the evidence of 'unlawful deceit.' How does a law enforcement officer accept a message that it is permissible to lie to obtain evidence, but not permissible to lie in a suppression hearing when the conviction or release of a murderer is in the balance. Empirical studies demonstrate that police are lying both in and out of court. . . . The consequences penetrate deep into the criminal justice system, as the authority of the courts and legitimacy of their rulings are based largely on integrity and trust." (Citations omitted.)); A. Clemens, Note, "Removing the Market for Lying Snitches: Reforms To Prevent Unjust Convictions," 23 Quinnipiac L. Rev. 151, 192 (2004) ("[A]n officer [may grow] 'convinced that the suspect is factually guilty of the offense, may believe that necessary elements of legal guilt are lacking [and feel] that he/she must supply the missing elements.' For example, one police officer explained how 'it is often necessary to "fluff up the evidence" to get a search warrant or [to] ensure conviction [so this] officer will attest to facts, statements, or evidence [that] never

former coercive per se; see *State* v. *Cayward*, supra, 552 So. 2d 973–75; a distinction adopted by a few other courts. See *State* v. *Patton*, 362 N.J. Super. 16, 31–32, 826 A.2d 783 (App. Div.), cert. denied, 178 N.J. 35, 834 A.2d 408 (2003); *State* v. *Farley*, 192 W. Va. 247, 257 n.13, 452 S.E.2d 50 (1994). I agree with those courts that have rejected the proposition that a verbal lie about evidence will necessarily have less of an effect than presenting that same lie in physical form, i.e., false test results. See, e.g., *State* v. *Baker*, supra, 147 Haw. 431 ("[t]o the suspect, who does not expect the police to lie, there is no meaningful distinction between being given a piece of paper that purports to document guilt and an officer's confident assertion that scientific evidence incontrovertibly establishes the suspect's guilt"); see also M. Gohara, supra, 33 Fordham Urb. L.J. 833 ("Both sorts of official misrepresentation offend traditional notions of due process. Forgery and oral misrepresentation differ from one another only in degree rather than in kind.").

State *v.* Griffin

occurred or occurred in a different fashion.' Police offi-
cers rationalize these lies, often themselves criminal
acts, 'because they are necessary to ensure that crimi-
nals do not get off on "technicalities." ' '' (Footnotes
omitted.)); D. Young, supra, 28 Conn. L. Rev. 463–64
("The justification of lying for the public good . . .
may readily transfer to other lies. The officer wants
to convict the criminal, punish him, and protect other
potential victims throughout the officer's involvement
in the case, not just during interrogation. For example,
an officer may extend this justification to lying on a
warrant affidavit for a search. . . . The officer's
motives may also trigger lies to third parties, such as
to encourage consent for a search or to encourage false
testimony by others. . . . In an even more egregious
application of this justification, an officer may lie at
trial, committing perjury to obtain the conviction of
someone he believes is guilty. . . . The inherent prob-
lem with lying for the public good is that people who
believe their entire work is for the public good, as police
officers do and should, may use this rationale to justify
any and all lies that they tell . . . .'' (Footnotes
omitted.)).

Beyond concerns about the practical consequences
of sanctioning lying, there are moral and ethical con-
cerns. "[S]tate officials, at least in a democracy, must
aspire to be relevant epistemic authorities on the law
and on at least that aspect of morality embodied in law.
We *should* be able to rely on their transmissions about
the content of law, legally relevant morality, and legally
relevant facts. These ideas would render police misrep-
resentation—even to a wrongdoer—especially morally
problematic. If their role partly involves serving as a
reliable epistemic repository, then the police subvert
their own role when they misrepresent the content of
the law, the moral severity of an offense, or the evidence
they have collected. . . . Because their epistemic

responsibilities are bound together with and frame their investigatory aims, the police cannot argue that the mere significance of the end justifies the suspension of the truthfulness presumption.'' (Emphasis in original.) S. Shiffrin, Speech Matters: On Lying, Morality, and the Law (2014) p. 198; see also *Miranda* v. *Arizona*, supra, 384 U.S. 479–80 ('' 'Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our [g]overnment is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the [g]overnment becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this [c]ourt should resolutely set its face.' ''), quoting *Olmstead* v. *United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting).

Despite the aforementioned concerns, there are those who would argue that allowing the police to lie, at least in interrogations, is a necessary evil. Confessions undoubtedly may be essential in some cases. See *Moran* v. *Burbine*, 475 U.S. 412, 426, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (''[a]dmissions of guilt are more than merely desirable . . . they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law'' (citation omitted; internal quotation marks omitted)); see also *McNeil* v. *Wisconsin*, 501 U.S. 171, 181, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991) (''the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good''). But, although confessions may be essential proof in some

State *v.* Griffin

cases, it does not follow that lying to obtain those con-
fessions is equally necessary.

There is a wealth of evidence that nonconfrontational
interrogation methods, which do not sanction lying to
suspects, are at least as effective as inquisitorial, advers-
arial methods like the Reid method. This evidence is
found in empirical research; see *Dassey* v. *Dittmann*,
supra, 877 F.3d 335–36 (Rovner, J., dissenting); M. Kim,
supra, 52 Gonz. L. Rev. 517; S. Tekin et al., "Interviewing
Strategically To Elicit Admissions from Guilty Sus-
pects," 39 Law & Hum. Behav. 244, 244–46 (2015); the
practices of other countries that have successfully
shifted from the inquisitorial, adversarial Reid method
to information gathering, conversational models; see
M. Kim, supra, 513 (England); W. Kozinski, supra, 16
Seattle J. Soc. Just. 333–34 (United Kingdom, Norway,
and New Zealand); Royal Canadian Mounted Police,
The Art of an Effective Interview: Why Non-Accusatory
Is the New Normal, (January 13, 2017), available at
http://www.rcmp-grc.gc.ca/en/gazette/the-art-an-effective-
interview (last visited July 19, 2021) (Canada); and the
adoption of rules by foreign courts prohibiting misrep-
resentation of evidence. See C. Slobogin, "An Empiri-
cally Based Comparison of American and European
Regulatory Approaches to Police Investigation," 22
Mich. J. International L. 423, 443–44 (2001) (English
and German courts developed special rules barring
deception).[36]

One of our nation's largest police departments, the Los
Angeles Police Department, is in the process of abandon-

---

[36] It should be noted that, although there is evidence that the United
Kingdom has a higher or similar rate of confessions as the United States;
see C. Slobogin, "Lying and Confessing," 39 Tex. Tech L. Rev. 1275, 1282–83
and nn. 43 and 44 (2007); the United Kingdom permits the police to continue
questioning suspects even after they have indicated a desire to remain silent
and to tell suspects that their silence may be used against them. Id., 1282–83;
see also C. Slobogin, supra, 22 Mich. J. International L. 446.

State *v.* Griffin

ing Reid style interrogation methods in favor of noncon-
frontational techniques developed by the High-Value
Detainee Interrogation Group (known as HIG), a joint
effort of the Federal Bureau of Investigation, the Central
Intelligence Agency, and the Pentagon, created to conduct
noncoercive interrogations. See R. Kolker, The Marshall
Project, Nothing but the Truth: A Radical New Interroga-
tion Technique Is Transforming the Art of Detective
Work: Shut Up and Let the Suspect Do the Talking (May
24, 2016), available at https://www.themarshallproject.
org/2016/05/24/nothing-but-the-truth#.gR9TabJrx (last
visited July 19, 2021).

To those who would argue that we must permit lying
during interrogations because we sanction lying in other
contexts that are necessary for effective law enforce-
ment (i.e., undercover activities, use of informants,
etc.); see, e.g., *Sheriff, Washoe County* v. *Bessey*, 112
Nev. 322, 328, 914 P.2d 618 (1996); L. Magid, "Deceptive
Police Interrogation Practices: How Far Is Too Far?," 99
Mich. L. Rev. 1168, 1182 (2001); there are fundamental
distinctions in those other circumstances that may jus-
tify different treatment. Those circumstances do not
involve actions by the police presenting themselves as
officers of the law, or the use of psychologically coer-
cive tactics to pressure the suspect to make inculpa-
tory statements.[37]

---

[37] See *Lewis* v. *United States*, 385 U.S. 206, 209, 87 S. Ct. 424, 17 L.
Ed. 2d 312 (1966) (The court acknowledged, in the context of information
obtained by an undercover agent, "that, in the detection of many types of
crime, the [g]overnment is entitled to use decoys and to conceal the identity
of its agents. The various protections of the Bill of Rights, of course, provide
checks upon such official deception for the protection of the individual.");
see also *Hoffa* v. *United States*, 385 U.S. 293, 302, 87 S. Ct. 408, 17 L.
Ed. 2d 374 (1966) (use of government informant to obtain incriminating
statements was not violation of fourth amendment when informant was
invited to defendant's hotel suite and was not "a surreptitious eavesdropper,"
and defendant was relying on his "misplaced belief that a person to whom
he voluntarily confides his wrongdoing will not reveal it").

State *v.* Griffin

The broad societal harms caused by allowing the police to lie during interrogations, along with the risk of false confessions, may support a per se ban on this practice, whether as a matter of legislation action or the exercise of the court's supervisory authority. The best course of action would be for our state and local police to abandon this tactic before such action is necessary, as some police departments in other states already have done. To be clear, I do not presently suggest that we adopt so extreme a rule as a per se ban. For now, it is sufficient to lay out concerns that should be considered, in a future case, when deciding whether this court should give this particular tactic greater weight in assessing whether the defendant's confession was coerced. For the reasons stated in part II of this opinion regarding the many other coercive tactics applied in the present case in conjunction with the false evidence ploy, I cannot agree with the majority's conclusion that the defendant's confession was voluntary under the totality of the circumstances.

I respectfully dissent in part.